# LITTLE & DEAN v. FIDELITY & DEPOSIT CO. OF MARYLAND.

Western Section.   April 1, 1926.

Petition for Certiorari denied June 28, 1926.

1. **Principal and surety. Where contract of builder provides for alterations the surety will not be discharged because of material alterations without notice to it.**

It is well settled that if the contract between the owner and the contractor permits alterations to be made in the work to be done, or if the bond itself permits the alteration, the surety will not be discharged by reason of a material alteration made without his express consent, where such alteration is one contemplated by the stipulation permitting alterations.

2. **Principal and surety. The letting of additional work by original contractor to a second subcontractor, held not to relieve surety of first subcontractor.**

In an action by the principal contractor to recover against the surety of a subcontractor where the original contractor had a contract with the State for the building of roads, and after the letting of the subcontract for the building of the bridges to defendant's principal, the State required the contractor to build two more bridges and these were let to a second subcontractor, held not to be a material alteration of first subcontractor's contract, and the surety was not released.

3. **Principal and surety. Immaterial change does not release surety.**

Material changes in building contracts discharge sureties on bonds given to secure their performance, but immaterial changes involving neither extra expenses nor time do not.

4. **Principal and surety. Premature payments on contract will release the surety on contractor's bond.**

Where the owner fails to retain the percentage required by the contract or makes larger payments than called for by the contract it will release the surety on the contractor's bond.

5. **Principal and surety. Where principal contractor paid for materials used by subcontractors, held not to release surety on subcontractor's bond.**

Where the contract between the original contractor and the subcontractor for State Highway provided that the subcontractor should pay all debts for material at the end of each month, and if he failed to do so the same should be paid by contractor and deducted from allowance due the subcontractor and where the subcontractor ordered a large amount of materials which he failed to pay for and which were paid for by the original contractor, held not to waive the sureties' liability on its bond.

Appeal from Chancery Court, Shelby County; Hon. I. H. Peres, Chancellor.

Reversed.

W. M. Hall, and Crabtree & Crabtree, all of Memphis, for appellant.

Sively, Evans & McCadden, of Memphis, for appellee.

SENTER, J. On August 26, 1921, complainants Little & Dean contracted with the Highway Department of the State of Tennessee for the construction of a certain road and bridges thereon in Henry county. On September 22, 1921, complainants entered into a contract with F. P. Wallace, under the terms and provisions of which they sublet to said F. P. Wallace the construction of the bridge work which Little & Dean had contracted with the State Highway Department to construct.

At the time Little & Dean contracted with the State Highway Department an approximate amount of yardage of concrete was set forth in the contract. The specifications for the construction of the highway, including all the culverts and bridges were made a part of the contract. By the terms of the contract which Little & Dean

entered into with F. P. Wallace, F. P. Wallace contracted to do all the culvert and bridge work that Little & Dean had contracted with the Highway Department to construct, and to construct same according to the plans, and specifications of the contract which Little & Dean had entered into with the State Highway Department.

The contract between the State Highway Department and Little & Dean for the construction of the highway and culverts or bridges under twenty feet was òn the usual printed form then used by the State Highway Department, and constituted one contract. The contract for the building of all bridges above twenty feet was on the usual standard bridge specifications, proposal, contract, etc. Little & Dean bid off all the work incident to the construction of the highway including the contract for the building of all culverts and bridges. The contract for the building of the highway and the bridges is contained in the respective pamphlets setting forth specifications, proposal, contract, etc. These specifications, proposal, and contracts are elaborate, containing many provisions, recitations and conditions. The contract entered into between complainants Little & Dean and F. P. Wallace was made subject to all the conditions, provisions and stipulations of the original contract, or contracts, between Little & Dean and the State Highway Department, for the construction of the concrete culverts and bridges. It is only necessary to notice provisions 28 and 29 of the highway contract and provisions 29 and 30 of the bridge contract, which sections alone become necessary for the determination of any of the questions presented for determination, and the provisions in sections 29 and 30 of the bridge contract are substantially the same as provisions 28 and 29 of the road contract, and are as follows:

"29. Alteration of Plans or Character of Work.

"The Engineer reserves the right to make such alterations in the plans or in the character of the work as may be considered necessary or desirable from time to time to complete fully and perfectly the construction of the structure, provided such alterations do not change materially the original plans and specifications, and such alterations shall not be considered· as a waiver of any condition of the contract nor to invalidate any of the provisions thereof. Should such alterations in the plans result in an increase or decrease of the quantity of work to be performed, the Contractor shall accept payment in full at the contract unit prices for the actual quantities of work done; or should such alterations be productive of increased cost or result in decreased cost to the Contractor, a fair and equitable sum therefor, to be agreed upon in writing by the Contractor and the Engineer before such work is begun, shall be added to or deducted

from the contract price, as the case may be. No allowance will be
made for anticipated profits.

"30. Additional Work.

"The Contractor shall perform such work, in additional quantities
other than those designated in the approximate estimate, as may be
deemed necessary to complete fully the structure as planned and con-
templated and shall receive for such additional work, payment in full,
at the prices shown in the contract and in the same manner as if such
work had been included in the original estimate of quantities."

The defendant Fidelity & Deposit Company of Maryland, became
the surety on the bond of F. P. Wallace to Little & Dean for the
performance of the contract according to its terms and provisions,
in the sum of $48,821, the estimated contract price for the work
undertaken by Wallace being about $97,642. The defendant surety
company occupied the status of "compensated surety."

After the contract between complainants and F. P. Wallace had
been entered into in September, 1921, and some time prior to Jan-
uary 1, 1922, the State Highway Department made certain additions
to the concrete work by adding two additional bridges, increasing
thereby the total amount of yardage from about 3,000 yards origi-
nally estimated to about 3400 yards, or an increase of about 400 ad-
ditional yardage of concrete construction.

About January, 1922, and after the additional yardage had been
ordered by the Highway Department, it was agreed between
Little & Dean and F. P. Wallace, that because of the slow progress
then being made by F. P. Wallace, Little & Dean would not re-
quire F. P. Wallace to do the additional work under his contract,
but would sublet this additional work to A. B. Axtell. This ar-
rangement was made, and Little & Dean proceeded to sublet this
additional work to A. B. Axtell and released or relieved F. P. Wallace
of the construction of this additional work. No notice was given
to the defendant company of this action upon the part of Little &
Dean and F. P. Wallace. The amount of work sublet to Axtell,
a part of which was performed by another contractor, Sharpe &
Bishop, amounting in all to approximately $27,000.

The record further discloses that under the terms and provisions
of the contract between complainants and F. P. Wallace, complain-
ants were to retain 10 per cent of the contract price until the com-
pletion of the contract by Wallace. It was also provided that at the
end of each month F. P. Wallace should pay all debts for labor and
material, and in the event of the failure of Wallace to discharge all
debts for material and labor, the same would be paid by Little &
Dean out of and deducted from the allowance due said subcontract-
or for the succeeding month. It was further provided that at the
completion of the work the contractor should publish a proper notice

to all creditors, requiring said creditors to propound their claims
for any money due them for work or materials furnished to the sub-
contractor, and as to any such creditors who had not received the
amounts due them, the same to be paid and discharged out of the re-
tained percentage due the subcontractor, and deducted from the
amount that would otherwise be due him upon final settlement.

On July 14, 1922, F. P. Wallace executed to Little & Dean an in-
strument in the nature of a bill of sale and an assignment, by the
terms of which he purported to sell and transfer to Little & Dean the
live stock and equipment used by Wallace in connection with the
contract, and in the same instrument transferred and assigned and
released unto Little & Dean all of the 10 per cent retainage then
due to him or that may become due to him on said work, and made
the assignment of said retainage subject alone to the rights and in-
terest of the Fidelity & Deposit Company of Maryland, surety on
his bond. A few days later F. P. Wallace executed another instru-
ment to Little & Dean for the same personal property, that is, the
live stock and equipment then being used by Wallace in connection
with his contract, which was also dated July 14, 1922. The con-
sideration for the first instrument or transfer as recited was that
Little & Dean had become the surety of F. P. Wallace on an in-
debtedness to the bank in Paris in the sum of $6,500, and also
Little & Dean had a debt against F. P. Wallace for the sum of
$3,200 due by account for materials, etc., and Little & Dean agreed
to satisfy the $6,500 debt to the bank and to also discharge Wallace
from liability on said debt to the bank, and also satisfy their debt
against Wallace amounting to $3,200 for materials. The second in-
strument stated a consideration of $4270 as having been placed
to the credit of F. P. Wallace by Little & Dean in the bank. The
second instrument did not undertake to assign the 10 per cent re-
tainage. The consent of the defendant surety company was not
obtained by Little & Dean or Wallace for the making of the assignment
or transfer under either instrument dated July 14, 1922.

On October 12, 1922, complainants advised the defendant by
letter that Wallace had failed to complete his work within the time
agreed on, and was unable to pay for material bought by him, and
had reached the point where it was impossible for him to purchase
any more material, and that his work was at a standstill, and con-
cluding the letter with these words: "We are, therefore, compelled
to look to you as surety, and as it is necessary that Mr. Wallace's
work be taken over and completed as quickly as possible, we will
ask you to let us hear from you promptly." The defendant re-
plied to this letter on October 19th, and in which letter defendant
stated; "We presume there has been a default under the contract
and this is to advise that we waive any and all of our rights to

complete this contract. This waiver is made without prejudice to our interests in the matter.'' On October 24, 1922, complainants, through their attorney, wrote the defendant as follows: ''Your letter of the 19th, addressed to my clients, Messrs. Little & Dean, of Paris, Tennessee. Default has been made by Mr. Wallace in the carrying out of his contract in the particulars referred to in the letter from Messrs. Little & Dean, to you, under date of October 12, 1922. Acting under the waiver of your rights to take over the contract and complete the work, my clients will proceed to take over the work and prosecute it to completion with as little loss to you and your principal as possible.''

On October 30, 1922, defendants replied to the above as follows: ''We have and thank you for your letter of October 24th in reference to the above, advising that your client would proceed to take over the above work and complete with as little loss as possible.'' On October 21, 1922, Wallace addressed a communication to Little & Dean, reciting that he had been unable to complete the work in the time called for, and to pay for material and was unable to complete the contract, and requested Little & Dean, the contractors, to take over and complete the work.

In pursuance of this arrangement complainant proceeded to complete the part of the work that had been contracted to Wallace, (not including the work subsequently sublet to Axtell).

Upon the completion of the work complainant rendered a statement to defendant for the excess cost and for the unpaid material bill paid by complainant, amounting in all to about $21,271.64, and demanded payment of this sum from the defendant.

The defendant denied liability, claiming that the contract had been so materially changed and altered without its consent, as to release it from liability; also claiming that the taking of the assignment of the retainage, and the failure upon the part of complainant to reserve out of monthly estimates the debts for labor and materials owed by Wallace without the consent of defendant, operated to release and discharge the defendant from liability on the bond. Whereupon, complainant filed the original bill in this cause, seeking to recover against the defendant the sum of $23,699,42 alleged loss and expense incurred by complainants by reason of the failure of F. P. Wallace to complete the work according to the terms and provisions of the contract.

The defendant answered the bill denying liability, setting up the reasons above set forth. At the hearing of the cause the Chancellor dismissed the bill at the cost of complainants, and filed a written opinion in the record, setting forth his conclusions. From the decree of the Chancellor complainants have perfected their appeal to this court and have assigned numerous errors.

The first three assignments of error present the questions to be determined on this appeal, and are, in fact directed to the three grounds designated by the learned Chancellor in his opinion filed in the record. The first three assignments of error are as follows:

I.

"The Chancellor erred in holding that complainants' subletting the additional bridges to Axtell was a change in the contract which released and discharged defendant from liability.

II.

"The Chancellor erred in holding that Wallace's assignments to complainants of his retained percentages, although subject to the rights of defendant, released defendant from liability.

III.

"The Chancellor erred in holding that there was a condition of the contract requiring complainants to pay Wallace's arrearages out of succeeding estimates."

It is uncontroverted that about January 1, 1922, complainant sublet certain of the bridge construction work to Axtell. The work consisted of certain additional bridges or concrete work that the Highway Department required complainant to construct under the provisions of their original contract, and which it was insisted was covered by Sections 29 and 30 of the bridge specifications and contract which has heretofore been noticed in this opinion. The other additional work complained of was changing the specifications of one of the bridges so as to make it a double span in place of a single span, as originally specified, the last item referred to being one of the bridges that remained to be constructed by Wallace, and not subsequently sublet to Axtell.

At the time the original contract was signed it was not then definitely known the exact bridges that would be required · on this piece of road or the exact sizes or the exact location. It appears from the record, and it is not controverted, that at the time of the letting of the original contract to the complainant for the construction of this highway, that the amount of concrete work for culvert and bridges was but an approximate estimate and was subject to such changes and additions or reductions as the Highway Department might deem necessary, and later order to be constructed by the contractor.

The parties seemed to recognize the right of the Highway Department to require the building of these two additional bridges, and also to change the specifications as to the other bridge in question, as being within the provisions of the contract between com-

plainants and the State Highway Department. Likewise, F. P. Wallace, the subcontractor, recognized this right as is evidenced by the fact that he assented to the arrangement by which he would be released from performing this additional work, and agreed in writing that the same be sublet to Axtell. The contract between complainants and Wallace included all the concrete work which complainants had undertaken under their original contract with the State Highway Department. If, therefore, the Highway Department under its contract with complainants, could exact and require of complainants the construction of the additional bridges and yardage of concrete, it essentially follows that the complainants could require Wallace to perform the same work under his contract.

We are of the opinion that the addition subsequently made by the State Highway Department changing from a single to a double span on one of the bridges which Wallace was to build, and which was covered by the original specifications in the contract, was certainly authorized and warranted under provisions 29 and 30 of the specifications and contract. By subletting the two additional bridges to Axtell, Wallace was relieved of any duty, or obligation, he may have been under to construct these additional bridges under his contract.

In the brief of appellee, after quoting section, or provision, 29, learned counsel for appellees makes this statement in the brief:

"We submit that the reading of this section clearly shows that it was in contemplation of the parties for this section to cover such comparatively insignificant amounts of additional work as may be necessary to complete any one bridge."

On page 19 of the same brief, appellee states as follows:

"It is our contention that appellant could not increase the amount of work covered by Wallace's bond without releasing the surety; it is also our contention that they could not take away from him any work covered by his contract without releasing the surety. It is conceded that appellants did both— they added to his contract and they took away from his contract."

It occurs to us that this is an inconsistent contention or attitude assumed by appellants. By this contention it is first insisted that appellants could not increase the amount of work covered by Wallace's bond without releasing the surety. It is then contended that appellants could not take away from him any work covered by his contract without releasing the surety. If learned counsel for appellees is correct in the contention that complainant could not have required of Wallace the construction of the two additional bridges, then we are unable to understand how the appellee could complain that complainant sublet the construction of these two bridges to

Axtell. Nor do we understand how it could at the same time be insisted that by subletting these two additional bridges to Axtell, that it was taking away from Wallace any part of his contract.

The contention made that by subletting these two additional bridges to Axtell was taking from the work previously contracted to Wallace is inconsistent with the contention that these two bridges were never included in Wallace's contract with complainant. It must be admitted that Wallace undertook to do all the concrete work that complainant had originally contracted with the Highway Department to do, and if the complainant was under contractual obligations to construct these two new bridges under its original contract with the State Highway Department, it necessarily follows that Wallace became obligated by his contract to do the work for the complainant.

We think it a matter of considerable doubt whether the two additional bridges subsequently required to be built by the State Highway Department could have been exacted of complainant under its original contract, and if not, certainly complainant could not have required Wallace to do this additional work. However this may be, the fact remains that Wallace was relieved and released from building the two additional bridges and they were subsequently contracted to Axtell for construction, and no claim for any loss sustained in the construction of those bridges is made by complainant against defendant surety company.

In the notes to Woodruff v. Shultz, 16 Ann. Cases, 348, the general rule is thus stated:

"It is well settled that if the contract between the owners and the contractor permits alterations to be made in the work to be done, or if the bond itself permits the alteration, the sureties will not be discharged by reason of a material alteration made without his express consent, where such alteration is one contemplated by the stipulation permitting alterations."

Numerous cases from Federal and State courts are cited in support of the above rule.

The cases are numerous holding that changes in a building contract, where additional rooms or stories are added, after the original contract has been made, without notice to and consent of the sureties on the bond of the contractor, materially increasing the cost, and especially where the time limit is not correspondingly extended for the completion of the work, will discharge the surety. Crumbly v. Reicom, 4 Higgins, 645. (Citing Miller-Jones Furniture Co. v. Ice Cold Storage Co., 66 Ark. 287.) 22 Ind. 388; 32 Cyc., 188, and cases cited.

But assuming that the two bridges subsequently added by the State Highway Department came within the contract of complainants and Wallace, and the construction of which Wallace was relieved of

by his assenting, if not in fact, by his solicitation, and the same work let to Axtell, would this operate to release and discharge the defendant from liability as surety on the bond of Wallace? Was it a material change in the contract? Was it such a change in the contract as required the consent of the surety; would it, or could it, have been to the disadvantage of the surety, or increase the hazard of the surety, and was the surety deprived of any rights or benefits that would have enured to either Wallace or the surety, had the change not been made? These, we think, become the pertinent inquiries.

These two additional bridges were not specifically included in the original specifications and contracts; they were added after Wallace had contracted with complainants to construct the concrete work. At the time Wallace entered into the contract for the concrete work the yardage of concrete was estimated at approximately 3,000 cubic yards. No part of this 3,000 cubic yards was taken from Wallace by the subletting to Axtell. The two bridges sublet to Axtell required about 400 yards of concrete, they were located further from Paris, and more remote from railroad facilities, and required a longer haul of materials than the 3,000 cubic yards, the construction of which was not taken from Wallace.

It is evident from the record that these two bridges built at the same rate as the other concrete work per cubic yard were built at a loss to both Axtell and Sharp & Bishop, to whom they were subsequently contracted by complainant. It is a fair conclusion from the evidence in the record that Wallace could not have built these two bridges at any profit, if, in fact, he could have built them at all within the time limit, and that if he had been required to have built them it would have been at a greater loss.

Whatever loss Axtell and Sharp & Bishop sustained in the construction of these two additional bridges was not charged to the defendant. The whole amount on Wallace's contract that was sought to be charged to the defendant, resulted from the original portion of Wallace's contract, independent of these two bridges subsequently let to Axtell. It is clear from the record that Wallace's contract covered more work than he was able to perform on the original specification of approximately 3,000 cubic yards.

We reach the conclusion that the taking from Wallace of the construction of these two bridges, and subletting the same to Axtell was not a material change in the contract between complainants and Wallace, in the senses that the word "material" is intended to be used. It was not such a change that could have materially affected the liability of defendant on the undertaking in which defendant became surety for Wallace.

"Material changes in building contracts discharge sureties on bonds given to secure their performance, but immaterial changes involving neither extra expenses nor time do not." 32 Cyc., 188, citing cases.

Certainly it cannot be insisted that defendant was induced to become surety on Wallace's bond on the assumption that the State Highway Department would add to the specifications additional work, even though under the original contract between complainant and the Highway Department such addition could have been made. It could not have been in contemplation of the defendant surety company that such additions would be made, and that additional profits to Wallace could thereby be anticipated.

We cannot agree to the conclusion reached by the learned Chancellor in his opinion on this subject.

On the further question that additional concrete work was required by Wallace by changing or altering one of the bridges by changing it from a single span to a double span bridge, which the record discloses did not materially increase the cost, and was certainly not an unreasonable amount of additional work, came within sections 29 and 30 of the contract and specifications, and the addition by the Highway Department, or the change in the contract in that particular, was such a change or alteration as was in contemplation under the provisions of the contract referred to. The fact that Wallace was required to construct that bridge under the changes directed by the State Highway Department, was not such a change or alteration of the contract as would discharge the surety. Cross v. Allen, 141 U. S., 528, 35 L. Ed., 843; Beers vs. Wolf, 116 Mo., 179, 22 S. W., 620.

We again refer to the general rule on this subject in the note to Woodruff v. Shultz, supra, announcing the settled rule on this subject. We also cite U. S. v. Walsh, 115 Fed., 697; Fidelity, etc., Company v. Robertson, 136 Ala., 379; Peoples Lumber Company v. Gillard, 136 Cal., 55; Chester v. Leonard, 68 Conn., 495, 37 Atl., 397, in which the above rule is recognized.

The second assignment of error goes to the action of the Chancellor in holding that Wallace's assignment to complainants, although subject to the rights of defendant, released defendant from liability.

21 R. C. L., sec. 61, pp. 1013, states the rule as follows:

"Premature Payments on Working Contracts.

"It is a general principle that any material alteration in a building contract will release nonconsenting sureties on bond given to guarantee the faithful performance of the contract, and to protect the owner against any claims of liens for labor or materials used in the construction of the building. Whether a payment made by the owners before it has become due, or in an amount larger than provided for in the contract, is such a material

alteration of the contract as to release the sureties, is a question on which the decisions do not agree; but the weight of authority seems to be that such payments will release the sureties. Especially is this true in the case of a non-compensated surety. . . . So, generally, the courts declare broadly that the owner's failure to retain, until completion of the building, a specified percentage of the price of labor and material as required by the contract, discharges the surety absolutely and not merely to the extent of the premature payment, and in such case, it seems, no action on the part of the owner will revive the surety's liability.''

Many interesting cases are cited in support of the rule above stated, among which are noted Glen Company v. Jones (Cal.), 2 Ann. Cases, 764; Morgan v. Salmon (N. M.), L. R. A., 1915B, 407,

In some jurisdictions a distinction is made between ''compensated'' and ''non-compensated'' sureties. It is admitted that the defendant in the instant case is a compensated surety.

The first instrument containing the alleged assignment of 10 per cent retainage, dated July 14, 1922, was made subject to any rights of the defendant surety company. Subsequent to its execution, probably five to ten days, complainant prepared and had Wallace to sign another instrument, dating the same back to July 14, 1922, by the terms of which the same equipment and live stock was transferred or sold to complainant, but in the second instrument the provision assigning the retainage was left out.

Both Wallace and Dean state that the second instrument was intended to take the place of the first instrument. The reason for the execution of the second paper was that it was thought that the first instrument containing the assignment of the retainage might have the effect of releasing the surety company on the bond, and it was deemed best by the parties to rewrite the instrument, leaving out the provision for an assignment of the retainage.

Wallace states in his testimony that when Little presented the second instrument to him to sign Little explained the reason as above set out, and told him the first instrument would be torn up. It seems Wallace had a copy of the first instrument, and had sent a copy to Machen, his indemnitor to the defendant surety company, but that he did not mention this fact to Little; that Little did not know that he had sent his copy of the first instrument to Machen.

We think it clear that neither Wallace nor Little & Dean considered the first instrument in effect after the second instrument was signed. We do not find anything in the record that warrants the conclusion that Little & Dean relied on the first instrument or the assignment of the retainage contained in the first instrument or ever claimed any rights under the first instrument. It seems clear to us from the evidence of both Wallace and Little that they considered the second

instrument abrogated the first and was but a substitution of the second for the first instrument. Both these instruments transferred to Little & Dean the live stock and all equipment of Wallace's then being used by him on the work, and both instruments contained a provision that Wallace would continue to have the use of this property to be used by him on the work, and that a reasonable rental for its use would be charged.

The provision in the contract with reference to the retainage of 10 per cent is as follows:

"Said contractors are to pay the said subcontractor for said work as follows: Ninety (90%) per cent of the amount due said subcontractor as the work progresses as shown by the estimates turned in and allowed by the engineer on the contract from month to month, or as often as the contractor receives his money; the (10%) per cent being retained until the final completion of the whole contract of said contractors."

It appears from the deposition of J. W. Leigh, who was the bookkeeper for Little & Dean and who made up the general statement filed in the record as Exhibit "2" to his deposition, that the 10 per cent retainage is duly credited on the account, amounting to the sum of $5,514.09. This credit, as appears from the account filed in the record as Exhibit "2" to the deposition of J. W. Leigh, is in these words: "Retainage to F. P. Wallace for earnings up to October 21, 1922, $5,514.09."

So far as the record discloses this item clearly represents the total amount of retainage which was due to be retained from the total estimates for work performed by Wallace under his contract. There is nothing in the record that indicates that Little & Dean ever diverted any of the 10 per cent retainage or ever paid it, or any part of it, to Wallace. Complainants fully account to the defendant for the entire amount of the 10 per cent retainage and give proper credit for the same in the statement of credits made a part of Exhibit "2" to the testimony of J. W. Leigh.

We cannot concur in the conclusion reached by the learned Chancellor, that complainant breached the contract in the matter of the retained percentage. If the record disclosed that complainant had failed to retain the 10 per cent but had paid it out to Wallace or had otherwise diverted it so that it would not be available to be applied to Wallace's obligation for unpaid materials and labor accounts, or to his failure in not performing his contract, it would present a different question, and under the settled rule would operate to discharge the defendant as surety on the bond of Wallace. But such are not the facts as we find from the record.

There remains to be disposed of the further question with reference to the provision in the contract between complainants and Wal-

lace as to the payment of all materials and labor out of monthly estimates. The provision is as follows:

"It is a further condition of this contract that said subcontractor shall promptly pay and discharge at the end of each month all debts owing by him for material and labor performed on this contract, and in the event he fails to do so, the same shall be paid by said contractors out of and deducted from the allowance due said subcontractor for the succeeding months, and at or before the completion of said contract as required by law, said subcontractor shall cause to be published a proper notice to all his creditors, requiring said creditors to propound their claims for any money due them for work or materials furnished on said contract and as to any such creditors who have not been paid, the amounts due them, the same shall be paid and discharged out of the retained percentage to said subcontractor and deducted from the amount that would otherwise be due them upon final settlement."

We have carefully examined the record in this case on the matters pertinent to the above provision in the contract. It appears that early in the winter of 1922 Wallace began to fall behind in his obligations for materials and labor used in connection with his contract. He was greatly hindered in the prosecution of the work by bad weather conditions. In the spring or early summer of 1922 a serious railroad strike was impending. Wallace states that, fearing as a result of the anticipated railroad strike he would be unable to procure proper shipments of the materials to be used in the work, and for this reason bought a large amount of materials and had same shipped to him at Paris; these shipments amounted to some fifteen or more car loads, and that he had to pay freight charges on all these shipments. He states that he arranged with the sellers of these materials to pay for same out of estimates as the materials would be used. In this way he became considerably behind in meeting his obligations for materials. He states that all the money he received from complainant from estimates as the work progressed he put into the work and in paying for labor and materials. He also states that he had procured complainants to do a considerable amount of hauling of gravel from a local gravel pit. This amounted to approximately $3,200, or more. This all went into the work that he was required to perform under his contract.

He also states that the money which he had obtained from the bank and the notes indorsed by complainant was also used entirely in the work and in the payment of labor and materials. Complainants seem to have been ready and willing to assist Wallace in any way they could in completing the work under his contract. We cannot see that the transaction between complainant and Wallace, whereby Wallace sold and transferred his live stock and equipment to com-

plainant in settlement of the debt which Wallace owed to complainant for hauling the gravel from the local pits, can be complained of by defendant surety company. Wallace was not denied the right to use this equipment and the proceeds from the sale was applied to the payment of labor and materials. We think this is clear from the record, and in fact, is not controverted by any evidence in the record.

The record also discloses that a considerable amount of the materials which Wallace had purchased in advance of actual need in anticipating the railroad strike, was still unused and was on hand at the time Wallace surrendered the contract.

However, it is contended for complainants that the provision in the contract between Wallace and complainant with reference to the payment for materials was for the protection of complainant, and was a condition that was intended to enure to the benefit of complainant and for the protection of complainant. It is also contended for complainant that the very purpose of having Wallace give bond covering the payment of all materials and labor was for the protection of complainant against claims that could be made against complainants for materials and labor in connection with the construction of the work contracted to Wallace. The bond upon which defendant became surety, by specific provision, covered the payment of all just and legal claims for labor and materials.

We do not think there was any breach of the contract on the part of the complainant with reference to the failure to see that material and labor bills were paid by Wallace out of respective estimates. It is evident from the record in this case that all the money which complainant paid to Wallace was used in the payment of labor and materials and whether the same was paid by complainants or by Wallace, we think, is immaterial.

We are of the opinion that before defendant could complain it would have to appear that complainant paid the monthly estimates to Wallace, and that Wallace did not use the money in the payment of bills for labor and materials. This fact does not appear from the record, and as above stated, all the evidence in the record on this subject is to the effect that all the money received by Wallace from complainants on estimates was properly used by Wallace in paying for labor and materials used in connection with the work he was required to perform under his contract.

We are of the opinion that the Chancellor was in error in holding that the defendant surety company had been discharged from liability, and in dismissing complainant's bill. The only proof in the record as to the amount complainants lost by reason of Wallace's failure to perform the work according to the contract, is the evidence offered by complainants, and especially the general statement of the account filed as Exhibit "a" to the deposition or testimony of J. W. Leigh, book-

keeper for complainants. This, according to the statement as appears on page 5 thereof, is $21,271.64.

It results that the decree of the Chancellor is reversed and judgment is here rendered in favor of complainants Little & Dean and against the defendant, Fidelity & Deposit Company of Maryland, for the sum of $21,271.64, and all costs of the cause, including this appeal, and for which execution may issue.

Owen and Heiskell, JJ., concur.