CENTRAL TOWERS APARTMENTS, INC., Royal
Indemnity Company et al., Appellee, v. ROBERT
THOMAS MARTIN, I. W. McGUIRE, JR.. d/b/a
McGuire Construction Company, et al., Appellant.
—453 S.W.2d 789.

Western Section. December 5, 1969.

Certiorari Denied by Supreme Court May 4, 1970.

Jack Petree, and Evans, Petree, Cobb & Edwards, Memphis, for appellant McGuire.

Jack McNeil, Memphis, for appellee Royal Indemnity Co.

MATHERNE, J. This appeal challenges a decree of the Chancellor which awarded to a surety on a contractor's performance bond the sum of $15,109.20 as attorney's fees and litigation expenses incurred by the surety

in the defense of a suit brought by the owner against the contractor, the surety and others for damages due to the breach of the construction contract.

The contractor I. W. McGuire, Jr., d/b/a McGuire Construction Company, brings Writ of Error to this Court and assigns six errors. With exceptions herein noted, these Assignments of Error raise the one determinative issue of whether the Chancellor erred in awarding the surety its attorney's fees and iltigation expenses.

Central Towers Apartments, Inc., the owner, entered into a contract with McGuire for the construction of an apartment building in Memphis, Tennessee. Royal Indemnity Company executed the contractor's performance bond in the amount of the contract price and received its regular premium therefor. In order to obtain this bond McGuire, the contractor, executed an indemnity agreement to Royal Indemnity the surety wherein McGuire agreed to hold the surety harmless for any amount paid by the surety as an obligation under the contractor's bond.

The apartment building was to be permanently financed by the Federal Housing Administration and all plans, specifications, the construction, payments and the final acceptance of the building were subject to the approval of that Agency.

The construction contract is dated February 24, 1961. This contract is a "cost plus" contract wherein the owner agreed to pay the costs of labor and material expended plus 6.75 percent, with a top side limitation of $2,074-, 394.00. The contractor was to commence construction within thirty days and complete the work within twenty-four months from date of contract. This contract had the

customary retainage clause to the effect that each month when the contractor submitted a monthly estimate of the labor expended and material in place he would receive 90% of that sum and 10% would be withheld by the owner as a retainage to insure complete performance by the contractor. The final contract price was $2,103,013.94, and 10% thereof was subject to retention until the contract was completed.

The building was completed and accepted by the owner on December 12, 1962. This acceptance was subject to the correction of certain deficiencies noted at that date. The sum of $26,900.00 was set up in an escrow account to insure correction of the deficiencies noted. This acceptance was made with the approval of the owner, the architect, the contractor and the Federal Housing Administration, subject to the correction of listed discrepancies, and subject to a nine month and twelve month inspection and approval of construction by the Federal Housing Administration. The instruments signed on that occasion by the contractor clearly provided that the contractor remained liable on construction contract warranties.

Rather extensive leaks developed in the heating and airconditioning units. The Chancellor found that sometime in January 1963 there had developed about 300 such leaks and the owner at that time knew of this deficiency. The heating and airconditioning sub-contractor repaired numerous leaks at no charge to the owner. It developed that to attempt a repair of the units would not correct the deficiency. The manufacturer of the units, thereupon, at its cost, replaced throughout the building these defective units. This leakage caused some water damage to the building, and the owner alleged it caused him exten-

sive rent loss and other damage. It is to be noted the $26,900 escrow deposit of December 12, 1962 did not specifically cover the defective airconditioning units as they were not listed as defective and apparently were not known to be defective at that time.

The owner filed suit in the Chancery Court of Shelby County, Tennessee on November 5, 1963 for $350,000.00 as damages due to breach of contract. This suit named as defendants the contractor, surety, architect, heating and airconditioning subcontractor, heating and airconditioning equipment manufacturer, and the plumbing and plastering sub-contractors. After prolonged pleading, cross-bills and amendments to pleadings and cross-bills, and the taking of various depositions the case was set for trial on oral testimony before the Chancellor without a jury on May 8, 1968. On that date the claim of the owner, Central Towers Apartments, Inc. was settled by payment to it of the sum of $28,000.00. The record establishes that after allowance for various set-offs and claims by the parties one against the other, the substance of the settlement was that most of this amount was paid by the heating and airconditioning equipment manufacturer. The surety on the contractor's bond did not pay any amount, and apparently contributed little if any effort toward the settlement. In fact there is competent evidence that the surety was uncooperative toward the efforts to settle.

In the pleadings the contractor brought a cross action against the heating and airconditioning sub-contractor and the manufacturer of that equipment. The surety sought judgment over against the contractor for any amount it might be held liable to pay and also sought judgment for its attorney's fees and litigation expenses

as against the contractor. After the matter had been settled as to all parties the Chancellor heard the issue on the surety's cross action against the contractor for its attorney's fees and expenses incurred, and rendered judgment in its favor as heretofore noted.

Based upon the December 12, 1962 acceptance the owned paid the contractor the amount due under the contract as follows: As of December 15, 1962 the owner had paid $1,769,500.00; on January 17, 1963 the owner paid $175,000.00 cash, claimed a credit of $5,503.59 for construction costs paid by it and deposited the $26,900.00 in escrow for correction of deficiencies noted on December 12, 1962, leaving a balance due of $126,110.35; on February 25, 1963 the owner paid $106,110.35 cash and executed its note in the amount of $20,000. The foregoing payments, escrow deposit, claim for credit and note total the contract price of $2,103,013.94. The owner did not withhold the 10% retainage.

Another matter concerning acts between the owner and the contractor must be here noted. The facts establish that to enable the owner corporation to enter into the project the contractor agreed to lend to the owner a sum of between $50,000.00 and $100,000.00 to be used in construction of the building. As consideration and inducement to the contractor to make this loan the owner gave to the contractor an option to purchase 50% of its common stock at the price of $1.00 per share. The Chancellor found that $98,610.50 was advanced by the contractor to the owner under this agreement. At some point of time thereafter one F. Allen Brown sought to purchase the owner corporation, and in consideration of the contractor assigning to him the option to purchase 50% of the stock

of the owner corporation, Brown executed his note to the contractor in the amount of $150,000.00 dated December 15, 1962, payable in five annual payments of $30,000 each plus interest at 5½% per annum. This $150,000.00 represented the $98,610.50 advanced by the contractor to the owner corporation which debt was assumed by Brown individually, and the remainder represented consideration for the option to purchase 50% of the stock of the owner corporation at $1.00 per share. It is to be noted this transaction between the contractor and Brown was after the December 12, 1962 acceptance of the building and before the January date the Chancellor found the owner had full knowledge of the extensive leaks and resultant damage.

The first payment on this $150,000.00 note was made when due. On default of the second and third payments the contractor, under the acceleration clause of the note, filed suit in the Circuit Court of Shelby County, Tennessee against Brown and one Widdicombe the makers of the note. In the meantime the present suit had been filed in the Chancery Court and Brown and Widdicombe filed a suit in Chancery to enjoin the suit at law on the ground that the present suit might result in a holding that the contractor was liable to the owner corporation for some amount due to breach of contract, and that Brown and Widdicombe would be entitled to set off that amount against the note owed to the contractor by Brown and Widdicombe individually. This injunction was denied by the Chancellor and the decree was affirmed in an opinion of the Supreme Court of Tennessee in the cause of Widdicombe et al v. McGuire, 221 Tenn. 601, 429 S.W.2d 601, 1968. In its opinion written by Special Justice Harbison, the Court stated:

"This (the note) was a personal undertaking and obligation of Brown and Widdicombe. On the other hand, the original suit brought in the Chancery Court (present action) in 1963 was brought by and on behalf of the corporation, in its corporate capacity, to recover damages for breach of the building contract. It does appear that thereafter the corporation was dissolved, and that Brown became the sole owner of its assets. We do not regard this fact, however, as constituting any special equity in Brown's favor which would make it mandatory for the Chancery Court to enjoin the Circuit Court action on the personal note given in December, 1962. * * *" (Parenthesis supplied explanatory to this suit.)

"There is no claim or suggestion of insolvency of any party in the case, so as to make applicable considerations of equitable set-off by reason of insolvency. * * *"

'At the time Central Towers Apartments, Inc., commenced its suit against him, (present suit) it seems clear that McGuire could not have plead by way of set-off or recoupment in that litigation the personal note of Brown and Widdicombe to him." (Parenthesis supplied explanatory to this suit.)

With this rather lengthy, but necessary, review of the conduct of the parties we now look to the provision of the indemnity agreement executed by the contractor indemnitor to the surety indemnitee. The liability of the contractor is stated in the Fourth Paragraph of the Agreement as follows:

"The undersigned will indemnify the Surety and hold it harmless from and against any and all claim, liabil-

ity, cost, charge, counsel fee (including fees of special counsel), expense, suit, order, judgment and adjudication whatsoever. Liability hereunder shall extend to any and all disbursements made by the Surety in good faith under the belief that it was liable for the amount so disbursed, or that it was necessary or expedient to make such disbursements, whether such liability, necessity or expediency existed or not. * * *''

■ We hold the foregoing paragraph would render the contractor liable for attorneys fees and litigation expenses properly incurred by the indemnified surety in the defense of a suit brought by the owner obligee against the contractor and surety. Assignments of Error II and III which insist that type suit and fee is not contemplated by the Agreement are overruled.

The surety indemnitee also insists upon the provision of the Sixth Paragraph of the Agreement to the effect that the conduct of the contractor and owner violated this paragraph and thereby denied the surety its subrogation rights in the $20,000.00 note made as final payment of the contract price, the $150,000.00 note executed by Brown and Widdicombe and the 10% retainage which was not withheld by the owner. Paragraph Sixth provides:

"The Surety shall be subrogated, as of this date, to all rights, privileges and properties of the Undersigned as Principal and otherwise in said contract; and

(1) the Undersigned hereby assign(s), transfer(s), and set(s) over to the Surety any and all monies and properties including all deferred payments, but excluding retained percentages, that may be due and payable at the time of such breach or default, or that

may thereafter become due and payable on account of extra work and material supplied in connection therewith, hereby agreeing that all such monies, and the proceeds of such payments and properties, shall be the sole property of the Surety to be by it credited upon any loan, cost, damage, charge and expense sustained, or incurred by it as above under its bond or bonds of suretyship; and

(2) the Undersigned hereby assign(s), transfer(s), pledge(s), and set(s) over unto the Surety and the Obligee, to be held by the Obligee for the security of both Obligee and Surety, as of the date hereof, all of the right, title and interest, of the Undersigned in and to all of the retained percentages that may be, or that thereafter may become, due and payable to the Principal on account of and relating to such contracts or on account of or relating to extra work and material supplied in connection therewith, to be by them credited, as their interest may appear, upon any loan, loss, cost, damage, charge and expense sustained, or incurred, by them.''

■ Under Paragraph Sixteenth of the Agreement of Indemnity the surety indemnitee could have demanded a deposit by the contractor to cover the entire amount sued for, which demand was not made or suggested by the surety.

The facts establish that the surety requested the contractor to employ attorneys to protect its interest. The contractor did employ competent attorneys to represent his and the surety's interest and notified the surety of this fact. The surety later decided that it should hire separate counsel because of the $20,000.00 note the con-

tractor had accepted as part payment of the contract price, and the fact that the original bill showed on its face that the 10% retainage had been paid by the owner to the contractor. The surety insists these facts justified the hiring of separate counsel because of a conflict of interest between it and the contractor.

It is undisputed that the contractor is solvent and financially able to pay any judgment which might have been obtained by the owner in this suit. The surety recognized the contractor's ability to pay.

When the surety hired separate counsel it was notified by the contractor that he would not be liable for the fees and expenses incurred.

In reaching his conclusion that the surety was entitled to be reimbursed its attorney's fees and litigation expense the Chancellor stated:

"The Court is of the opinion and so finds that when the owner paid the 10% balance of the retainage to the contractor without requiring correction of the patent defects in the building, and the payment for the contract breaches, and without giving the surety reasonable notice, it defeated the subrogation rights of the surety, and released the surety completely or pro tanto, thereby placing the contractor and surety in different positions of liability and creating a conflict of interest between the contractor and surety. The court is further of the opinion that another conflict of interest arose between the contractor McGuire and the surety because the surety was entitled to setoff a balance due on a debt which the owner owed to the contractor, said setoff involving the original $98,610.50 that had been loaned from contractor McGuire to

owner Central Towers Apartments, Inc., said corporation being subsequently dissolved and F. Allen Brown, dba Central Towers Apartments, becoming the successor in interest. The setoff was an additional defense of the surety in the instant case, and it was to the best interest of the surety to plead the setoff in the instant case, whereas the contractor sought to sue in the Circuit Court of Shelby County to collect the amount.

In view of the conflict of interest between the contractor and the surety as to the retainage and the setoff, the court is of the opinion and so finds that the surety acted in good faith in retaining counsel other than the contractor's counsel and in good faith expended * * *''

■ A provision in a construction contract requiring the owner to retain a certain percentage of all payments made during the completion of the contract is not only for the protection of the owner, but is also for the benefit of the surety on the contractor's bond. See cases annotated at 127 A.L.R. p. 15.

The Chancellor held that a premature payment of the retainage by the owner "* * * defeated the subrogation rights of the surety, and released the surety *completely or pro tanto,* thereby placing the contractor and the surety in different positions of liability and creating a conflict of interest between the contractor and surety.'' (Emphasis added) The Chancellor therefore did not determine whether the premature payment released the surety completely and in toto of all obligations under the bond, or whether it merely released the surety *pro tanto,* to the extent that the surety was injured by the payment. We feel this distinction is material to the issue

before the Court and that it must be determined to what extent the premature payment released the surety, and whether there is in fact a conflict of interest between the surety and the contractor when the extent of the release of the surety has been determined.

We do not find a reported decision of the Supreme Court of this State on the question presented. In the case of Little & Dean v. Fidelity & Deposit Company (1926) 3 Tenn.App. 157, the contractor Little & Dean let a subcontract to Wallace to do certain bridge construction. Fidelity & Deposit Company was surety on the performance bond of Wallace in favor of Little & Dean. The subcontract provided for a retainage of 10% of each monthly payment due Wallace as work progressed. Wallace executed a bill of sale conveying all his mules and equipment and the 10% retainage to Little & Dean. This instrument was later replaced with an identical instrument which did not assign the 10% retainage. Wallace defaulted in his performance and this suit was by Little & Dean against the surety of Wallace. The surety claimed the assignment of the 10% retainage released it from all liability. The Court held the parties were in fact operating under the second bill of sale from Wallace to Little & Dean which did not assign the retainage. The Court further found as a fact that Little & Dean had retained the 10% as contracted and had credited Wallace with the full amount thereof in its claim against the surety. However, the Court stated at p. 169:

"We cannot concur in the conclusion reached by the learned Chancellor, that complainant breached the contract in the matter of the retained percentage. If the record disclosed that complainant had failed to retain the 10 percent but had paid it out to Wallace or had

otherwise diverted it so that it would not be available to be applied to Wallace's obligation for unpaid materials and labor accounts, or to his failure in not performing his contract, it would present a different question, and under the *settled rule* would operate to discharge the defendant as surety on the bond of Wallace. But such are not the facts as we find from the record." (Emphasis added)

The "settled rule" which the Court in the *Little & Dean* case found to exist is quoted by the Court in that case from 21 R.C.L. sec. 61 p. 1013 as follows:

"* * * So, generally, the courts declare broadly that the owner's failure to retain, until completion of the building, a specified percentage of the price of labor and material, as required by the contract, discharges the surety absolutely and not merely to the extent of the premature payment. And in such a case, it seems, no act on the part of the owner will revive the surety's liability."

The *Little & Dean* case is cited with approval in the case of Town of Franklin v. Hermitage Engineering Co. et al. (1930) 12 Tenn.App. 434, however, the principle was not applied in that the bond in that case allowed an alteration of the contract without releasing the surety of its obligation. We therefore hold that the *Little & Dean* case is not authority for the "settled rule" therein quoted because the facts did not present to the Court in that case the issue now to be determined.

A provision in a construction contract that the owner will retain a certain percentage of all payments made during the progress of the construction not only creates a security for the benefit of the surety on the contractor's

bond, but also furnishes an incentive or stimulus to the contractor to complete the work in accordance with the contract, and a premature payment of this retainage by the owner to the contractor might on the latter ground deprive the surety of some degree of protection which the contract afforded him and under some situations tend to increase the surety's risk. See cases annotated at 127 A.L.R. p. 18.

The rule is now established by the weight of authority that a departure by the owner from the terms of a construction contract with respect to payments to the contractor will not have the effect of discharging a compensated surety on the contractor's bond, unless it appears that such departure resulted in injury, loss, or prejudice to the surety. See cases annotated at 127 A.L.R. pp. 62-67. "In accordance with this general rule, the great weight of authority supports the view that such an unauthorized payment has the effect of releasing a compensated surety only pro tanto, to the extent of the injury or prejudice suffered by the surety, and not necessarily to the full extent of the surety's obligation." 127 A.L.R. 69; 9 Am.Jur. Building and Construction Contracts, sec. 107, 1963 Pocket Supp. pp. 26-28.

This latter rule appears more in accord with reason and equity. A compensated surety should not suffer damage by breach of any duty or obligation resting upon the owner, but neither should the surety be allowed to profit thereby. If the breach on the part of the owner results in loss or damage to the surety, the surety should be protected to the extent of such damage, but no more. There can be no injustice in requiring a paid surety, when in the business for profit, to prove that the alleged misconduct on the part of the owner resulted not only in

damage, loss, or prejudice to him, but also to what extent. This is not to be construed as a holding that there can be no conduct on the part of an owner which will result in an absolute discharge of a paid surety, but what we hold is that as a general proposition the surety under these circumstances is entitled to be recouped or protected only to the extent of the loss, damage or prejudice actually sustained by reason of the breach on the part of the owner.

We have reviewed the cases of Hardison v. Yeamen (1905) 115 Tenn. 639, 91 S.W. 1111; Bell v. Trimby (1896) Tenn.Chan. App., 38 S.W. 100; Doherty v. Surety Company, 1 Tenn.Civ.App. 221; McLendon v. Bromley (1913) 3 Tenn.Civ.App. 494; Hale & Sons v. Stone and Aetna Casualty Company (1932) 14 Tenn.App. 461 and conclude that the issue now before the Court was not considered in those cases, and that those cases are not authority for the proposition that a failure of the owner to withhold a specified percentage of all payments due the contractor will amount to a complete release of the surety on the contractor's bond.

There being no proof that the premature payment of the 10% retainage caused the contractor to delay or fail to complete the construction with resultant loss, damage, or prejudice to the surety, and there being no proof from which it could be established that due to the premature payment the surety could have been damaged beyond the amount of the 10% retainage prematurely paid, we hold the surety was released from liability to the owner only to the extent of the 10% retainage prematurely paid, or the amount of $210,301.39.

■ Therefore, in that the surety was not totally released and it remained liable for amounts awarded the owner in excess of the retainage, both the contractor and the surety remain interested in defeating the claim of the owner for damages due to breach of the construction contract. Should the owner recover an amount as damages the surety would be liable to pay only if the contractor failed to pay, and should the contractor fail to pay the surety would be released up to the amount of the retainage prematurely paid by the owner to the contractor. Therefore, whether the owner held the retainage as agreed or paid it prematurely to the contractor, the position of the surety remained unchanged because in either event the surety would receive credit for the amount of retainage against any obligation it was called upon to pay the owner for the contractor. We therefore hold that the premature payment of the retainage by the owner to the contractor did not result in a change of position as between the contractor and his indemnified surety, nor did it result in a conflict of interest as between those two parties. The premature payment merely resulted in the owner losing his right to look to the surety to the extent of the retainage for any obligation due and unpaid by the contractor to the owner.

■ The fact that the surety in the case sought a judgment over against the contractor for any amount that might be adjudged against it does not create a conflict of interest between the surety and the contractor. The contractor indemnitor was liable to the surety indemnitee to pay any amount awarded against the surety. Therefore, the relief sought by the surety merely requested the Court to order the contractor to do what he had to do anyway and could not be deemed to have created a con-

flict of interest. For similar reasoning see the case of Commercial Standard Ins. Co. v. Cleveland (1959) 86 Ariz. 288, 345 P.2d 210.

The fact that the $150,000.00 note owed to the contractor by Brown and Widdicombe has no bearing on this lawsuit has already been determined by the Supreme Court of Tennessee. Regardless of how the surety wanted the note collected or in what court, the contractor had the right to collect the note at law as it was collected, and that note had no bearing whatsoever on the position of the parties under the indemnity agreement.

We therefore hold that the Chancellor erred wherein his decree found a conflict of interest between the contractor and the surety due to the failure of the owner to withhold the 10% retainage, and due to the collection of the $150,000.00 in the Circuit Court.

We do not find a reported decision of the Supreme Court of Tennessee on the issue of just when; or under what circumstances, an indemnified surety may incur attorney's fees and litigation expense at the cost of the contractor indemnitor when the indemnity agreement gives the surety the right to incur such expenses.

In Gibson County Bank v. Shatz (1930) 12 Tenn.App. 281, the corporate maker of a note became insolvent and the bank, holder of the note, sued Shatz, Ward and Taylor three endorsers on the note. Judgment was rendered against the three endorsers for the balance due on the note plus $500.00 attorney fee for the bank's attorney. Taylor filed an answer and cross-bill against defendant Shatz in which he alleged that he signed the note as endorser at the request of Shatz who had orally agreed to hold him (Taylor) harmless. The Court found that Shatz

did so agree to hold Taylor harmless and rendered judgment against Shatz in favor of Taylor for the amount Taylor paid on the judgment and also for the amount Taylor owed on the $500 attorney fee which the court awarded the holder of the note as attorney's fee.

In the *Gibson County Bank* case Shatz, who was Taylor's indemnitor, was held liable for the attorney fee awarded against Taylor in favor of the bank obligee. Whereas, in the case at bar Royal Indemnity, the indemnitee of McGuire, seeks to recover attorney fees incurred by it growing out of a defense of a suit brought by the obligee, Central Towers Apartments, Inc. We hold there is considerable difference in the two situations. First, the *Gibson County Bank* case dealt with an uncompensated surety; and secondly, and more importantly, in that case the indemnified surety (Taylor) was not attempting to collect his own attorney's fee, but was attempting to hold his indemnitor (Shatz) liable for attorney fees Taylor had to pay to the attorney of the obligee (bank) because of suit the obligee had to bring on the note which the indemnified surety (Taylor) indorsed.

In Transamerican Ins. Co. v. Bloomfield (6th Tenn. 1968) 401 F.2d 357, the surety sued to recover of Bloomfield on an indemnity agreement which Bloomfield executed to indemnify and save harmless the surety on account of a labor and material payment bond which the surety furnished Bloomfield in connection with a contract for the construction of seventy-four houses at Palo de Pan, Ponce, Puerto Rico. Numerous suits were filed in Puerto Rico against the contractor and the surety for material and labor claims. The surety advised Bloomfield of the claims being filed *and demanded that Bloomfield place with it sufficient funds to meet all proper claims.*

Bloomfield did not respond to the demand, his position being that he was not indebted to the claimants and that the contractor's bond did not cover the construction out of which the claims arose. The surety thereupon employed attorneys and accountants. One materialman's claim was defended on the ground that the claimant could not identify the claim as arising out of construction covered by the bond. The court awarded judgment in favor of the claimant, thereby rendering for naught the insistence of Bloomfield. The surety then proceeded to defend certain suits, compromise others for amounts less than the claim and did win certain contested suits and lost others. The Court found *the surety acted in good faith* in the entire matter and through all these proceedings and settlements. The indemnity agreement provided that Bloomfield agreed to:

> "* * * indemnify and save the Company harmless from and against every claim, demand, liability, loss, cost, charge, counsel fee * * * expense, suit, order, judgment and adjudication whatsoever, and any and all liability therefor, sustained or incurred by the Company by reason of having executed or procured the execution of said bond or bonds. * * *"

Another paragraph of the agreement gave to the surety the right to compromise and settle any claim filed under the contract. The Court held Bloomfield liable to the surety insurance company for all judgments rendered in the courts of Puerto Rico; for all settlements of claims made by the surety; and for all costs, attorneys and accountants fees, and expenses incurred.

The *Transamerican* case is distinguishable from the case at bar on three important points: (1) The surety

indemnitee in that case demanded of the contractor indemnitor that it deposit with the surety sufficient funds to meet all valid claims asserted against the contractor and the surety; (2) The contractor indemnitor refused to do this and did not in any way attempt to protect itself and the surety against the claims asserted; (3) The surety had to act in that case and the record reveals that it acted justly and in good faith for the protection of itself and the contractor.

We therefore hold that the *Gibson County Bank* case and the *Transamerican* case, relied on by the surety, do not constitute authority for the decree of the Chancellor in this case because both of those cases are distinguishable on the facts, and presented situations entirely different from the issue now before this Court.

The contractor relies on the following out of state decisions: American Surety Co. v. Vishonhaler (1912) 92 Neb. 1, 137 N.W. 848; Title Guaranty and Surety Co. v. Burke (1918) 134 Ark. 499, 204 S.W. 216; Maryland Casualty Co. v. Wood (1943) 296 Ky. 476, 177 S.W.2d 365; Pacific Indemnity Co. v. Harper (1939) 14 Cal.2d 379, 94 P.2d 586; Maryland Casualty Co. v. Hansen-Jensen, Inc. (1951) 15 N.J.Super. 20, 83 A.2d 1; American Surety Co. v. Lehr (1906) Tex.Ct.App. 93 S.W. 681.

In addition to the *Gibson County Bank* case and the *Transamerican* case heretofore noted, the surety relies on the following out of state decisions: Triangle Engineering Corp. v. Traveler's Indemnity Co. (E.D.N.Y.1947) 72 F.Supp. 112; Conway v. Union Indemnity Co. (1936) 185 La. 240, 169 So. 73; Fidelity and Casualty Co. of New York v. Mauney (1938) 273 Ky. 400, 116 S.W.2d 960;

United States Fidelity & Guaranty Co. v. Hittle (1903) 121 Iowa 352, 96 N.W. 782.

■■■ After a careful review of the foregoing authorities and others, we hold that when the principal and his indemnified surety are sued by the obligee under the surety's bond, and the surety exercises its right under the indemnity agreement of the principal to hire its own separate counsel and incur litigation expense in defense of the action, the liability of the principal for the attorney fees and expenses thus incurred by the surety depends upon whether, under all the facts of the case, it was reasonably necessary for the surety to so act in its own defense, and whether the surety acted in good faith toward the principal.

From an examination of the cases and texts we conclude the rule as above stated to be the law, and it is necessary in each case for the Court to look to the evidence to determine the question of good faith and reasonable necessity of the action on the part of the surety in creating these expenses which it seeks to recover of the principal.

Also from the cases, and based on what we consider sound reasoning, we find that those facts which will have a bearing on the reasonable necessity of action and good faith under the circumstances include, but are not limited to, such matters as the amount of risk to which the surety was exposed; whether the principal was solvent; whether the surety has called on the principal to deposit with it funds to cover the potential liability; whether the principal on demand by the surety to deposit with it the amount of the claim has refused to do so; whether the principal was notified of the action and given opportunity to de-

fend for itself and the surety; whether the principal hired the attorney for both himself and the surety; whether the principal notified the surety of the hiring of the attorney; the competency of the attorney hired by the principal; the diligence displayed by the principal and his attorney in the defense; whether there is a conflict of interest between the parties; the attitude and cooperativeness of the surety; and the amount charged and diligence of the attorney hired by the surety.

■ In weighing the position of the parties as to the good faith and reasonable necessity with which the surety acted in this lawsuit, we find that the surety, practically speaking, incurred no risk of loss by the premature payment of the 10% retainage. The surety's risk is also put in proper perspective by the settlement of all claims of the owner for $28,000.00. We admit the amount paid in settlement of the owner's damage cannot be used alone to fix the liability of the surety for its own fees and expenses, but this fact does reflect little or no effort on the part of the surety to investigate and determine the extent of liability. This surety has broad experience and daily encounter with claims of owners against contractors on bonds secured by the surety. This experience would charge the surety with knowledge, if it acted in good faith, of at least an approximate amount of the potential liability in a $350,000.00 claim which was settled for $28,000.00.

On the issue of good faith and reasonable necessity of action we further find that a solvent contractor did engage competent attorneys to represent the surety's interest, and notified the surety to this effect. There is no showing but that these attorneys were actively defending the suit and would have continued to do so. The contrac-

tor's financial ability to satisfy any judgment in the lawsuit is most pointedly established by the failure of the surety to demand a deposit by the contractor under the provisions of Paragraph Sixteen of the indemnity agreement. There was no conflict of interest between the contractor and the surety.

After applying the several factors to be weighed in determining the presence or absence of good faith and reasonable necessity in the actions of the surety, we conclude the surety did not act in good faith and under a reasonable necessity in the hiring of separate attorneys so as to charge the contractor for these fees and expenses. Assignment of Error I which asserts the Chancellor erred in awarding the attorney's fees and litigation expenses against the contractor is sustained. The decree of the Chancellor is reversed and the surety's cross-bill against the contractor is dismissed. It therefore is not necessary to pass on the other Assignments of Error not heretofore disposed of.

All costs in the Chancery Court relating to the trial of the issues herein and the cost of this review are adjudged against Royal Indemnity Company. This case is remanded to the Chancery Court of Shelby County, Tennessee for an adjudication of costs in that Court accumulated prior to the trial of the issues presented here, and for a decree in that Court adjudging those costs; and for a decree adjudging the amount of costs herein ordered against Royal Indemnity Company.

Carney, P.J.(W.S.), and Todd, J., concur.