# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 8, 1999 Session

## GULF INSURANCE CO. v. CONSTRUX, INC., ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 24472    Russ Heldman, Chancellor**

---

### No. M1999-02803-COA-R3-CV - Filed July 26, 2001

---

This is an appeal from the grant of Plaintiff's motion for summary judgment. The case arises from a construction contract in which Gulf Insurance Co. provided Construx, Inc. the required payment and performance bonds, and in return obtained an indemnity contract with the individual Defendants as indemnitors. Additionally, a Settlement Agreement was executed in connection with the permanent loan financing and Gulf settled the subcontractor liens with the remaining proceeds of the construction loan. After payments were made, Gulf sued for indemnity under the indemnity contract for payments made. Construx asserted that the Settlement Agreement barred Plaintiff's claims or, alternatively, Gulf did not act reasonably and in good faith in settling the claims and is not entitled to recovery. Summary judgment was granted to Gulf and Construx appealed. For the reasons below, we reverse and remand finding that there are genuine issues of fact, making summary judgment inappropriate.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Reversed and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM FRANK CRAWFORD and WILLIAM B. CAIN, JJ., joined.

James Robert Buckner, Alan Daniel Hall, Richard Christopher Rose, Chattanooga, Tennessee, for the appellant, Construx, Inc., et al.

Richard McCallister Smith, Nashville, Tennessee, for the appellee, Gulf Insurance Co.

### OPINION

This is an appeal from the grant of a motion for summary judgment to Gulf Insurance Company and an award of damages in the amount of $42,587.74 and attorney's fees totaling $85,763.44 for a total award of $128,351.18.

## I.  Background

In July 1994, Construx, the general contractor, entered into a contract with Roger Patel, doing business as Days Inn Incorporated, to build a Comfort Inn in Franklin, Tennessee.  In connection with this contract, Construx was required to provide a payment and performance bond to ensure performance of the contract and payment to all subcontractors.  Gulf Insurance Company, as surety, issued a performance bond and a payment bond to Construx, Inc. as principal.  Joseph Amszynski and Deborah Silverstein executed a General Agreement of Indemnity indemnifying Gulf for claims upon the bonds.  The bonds were executed on September 7, 1994, and the Indemnity Agreement was executed on October 26, 1994.

The construction project was complete in November of 1995. At the time of completion, there was approximately $165,000 remaining on the construction loan. Just prior to completion, several subcontractors began filing liens and claims for work and materials supplied but not paid for by Construx.  In order to obtain the permanent financing on the project, the liens and claims by the subcontractors needed to be resolved prior to closing.  Therefore, in early 1996, Mr. Patel, Gulf, Construx and First Tennessee Bank, the lender, discussed a Settlement Agreement to resolve all liens and claims of the subcontractors, closing of the permanent loan and distribution of the remaining $165,000.00 left on the construction loan proceeds.  All of the negotiations between Gulf and Construx pertaining to the Settlement Agreement were made between Gulf's attorney, Richard Smith, and the Defendant, Joseph Amszynski.

Mr. Amszynski claims that he was induced to enter the Settlement Agreement based on representations by Gulf's attorney that all claims could be settled for $110,000.00 and that attorney's fees would amount to no more than $10,000.00.  The parties agree that a Settlement Agreement was entered into in early February of 1996, among Mr. Amszynski, Gulf, First Tennessee and Mr. Patel.  Mr. Patel received, under the agreement, $30,000 of the $165,000 remaining as proceeds from the construction loan or contract, and Construx released the rest to Gulf to settle claims and to distribute any "savings" after such settlement according to the terms of the agreement.  Construx also executed a release for claims against Mr. Patel and First Tennessee.  Both parties agree that the Settlement Agreement provided that if the claims were settled for a total amount less than $135,000,[1] "any savings" would be divided by payment to the owner, Mr. Patel, of seventy percent (70%) and payment to the contractor, Construx, of thirty percent (30%).[2]

---

[1]Actually, one party asserts that the amount stated in the agreement, after revision, was $134,640.65.

[2]Gulf, however, would assert it was entitled to Construx's 30% of the "savings" pursuant to another provision of the agreement if there had been any "savings."

2

After the Settlement Agreement was purportedly[3] executed, Mr. Smith requested Construx to direct all subcontractor claims to him for settlement negotiations. Construx agreed. Prior to the Settlement Agreement, Construx had already provided Gulf records regarding subcontractor claims and continued to provide records to facilitate settlements including balance sheets, accounts receivable, accounts payable, offsets, credits and back charges.

Gulf settled all the claims regarding the construction project. During the settlement negotiations, Construx protested the payment of various amounts proposed by Gulf. The total of the amount paid out by Gulf in settlement of the claims was $177,228.39.

Gulf filed suit against Construx and the individual guarantors, Mr. Amszynski and Ms. Silverstein, seeking recovery of payments Gulf made to subcontractors to settle claims against Gulf's payment bond, which Gulf claimed was $42,587.74.[4] The complaint also sought recovery of attorneys' fees and expenses incurred by Gulf as a result of the settlement process and this litigation. Defendants answered and asserted that Gulf's claims were barred by the Settlement Agreement between the parties. They also asserted that Gulf had paid excessive, invalid, and disputed subcontractor claims.

Gulf filed a motion for judgment on the pleadings, which was opposed by Defendants. The trial court denied the motion, ruling that there were "genuine issues as to the amount, if any, of Plaintiff's claim against Defendants." Gulf later filed a motion for summary judgment, seeking $105,617.06 in damages incurred to that point.

Defendants responded arguing there were genuine issues of material fact as to whether Gulf's agreements with, and representations to, Defendants regarding the Settlement Agreement barred Gulf from recovery. They also asserted that genuine issues of material fact existed regarding the reasonableness and good faith in Gulf's payments to subcontractors.

After a hearing, the trial court granted Gulf's motion, awarded Gulf $105,617.06 in damages, and directed Gulf to submit evidence regarding its claim for additional expenses. When documents supporting those claims were filed, Defendants objected to this "alleged evidence." Various additional filings and objections took place. The trial court granted partial summary judgment on the $105,617.06 already awarded and set a hearing on the new expenses. The trial court later entered an order awarding Gulf the total amount of its claimed damages, $128,351.18.

Defendants had filed a motion to alter or amend the original summary judgment ruling, and Gulf responded. Four days after the hearing on this motion, Gulf filed a Notice of Filing a document

---

[3]We use the word "purportedly" in this recitation of the facts because, as will be discussed later in this opinion, although both parties claim the existence of an executed agreement, the record before us leaves some question on that point.

[4]The parties appear to agree that Gulf, pursuant to the Settlement Agreement, received $134,640.65 from the remaining construction loan proceeds.

it contended was the final executed version of the Settlement Agreement. Defendants had originally filed the purported Settlement Agreement with their answer and Mr. Amszynski's affidavit. The two documents are not identical.

## II. Summary Judgment

A trial court's grant of a motion for summary judgment presents a question of law that we review *de novo* without a presumption of correctness. *Finister v. Humbolt Gen. Hosp., Inc.*, 970 S.W.2d 435, 437 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). We must determine whether there is no genuine and material factual issue, thereby entitling movant, Gulf, to judgment as a matter of law. In making this determination, we view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor, affirming the summary judgment only when the facts and inferences permit a reasonable person to reach but one conclusion.

Accordingly, the appellate court must make a fresh determination concerning whether the movant has met the requirements of Tenn. R. Civ. P. 56. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). Summary judgment is only appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material facts and the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995); *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993).

Consequently, the questions a court must consider in determining whether to grant or deny a motion for summary judgment are (1) whether a factual dispute exists; (2) whether that fact is material; and (3) whether that fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214. "A disputed fact is material it if must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Id*. at 215. A disputed material fact creates a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.* The phrase "genuine issue " refers exclusively to factual issues and not to legal conclusions that could be drawn from the facts. *Id*. at 211.

Once the moving party documents its assertion that there is no genuine issue of material fact, the burden then shifts to the nonmoving party to show the existence of such issue, requiring submission to the trier of fact. *Id*. at 215. The nonmoving party cannot simply rely on its pleadings, but rather must set forth, by affidavit or discovery materials, specific facts showing a genuine issue of material fact for trial. *Id.* The evidence offered by the nonmoving party must be taken as true. *Id.* Finally, summary judgment shall be denied if there is "any doubt whether or not a genuine issue exists." *Id*. at 211.

A court reviewing summary judgments must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor.

4

*Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997); *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 792 (Tenn. 1996). Thus, a summary judgment should be granted only when the undisputed facts reasonably support one conclusion - that the moving party is entitled to a judgment as a matter of law. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d at 26.

In its grant of summary judgment, the trial court held "there are no genuine issues of material fact and summary judgment should be entered in favor of the Plaintiff and against Defendants." In this appeal, Defendants, Construx and the individual indemnitors, first argue that summary judgment in Gulf's favor was not warranted because genuine issues of material fact exist as to whether Gulf's claims are barred by the Settlement Agreement and related representations. In this regard, Defendants rely on their asserted affirmative defenses of estoppel and accord and satisfaction. Defendants also assert that Gulf was not entitled to summary judgment because genuine issues of material fact exist as to whether Gulf acted reasonably and in good faith in settling the subcontractor claims.[5]

### III. The Settlement Agreement

Defendants have defended on the basis of the Settlement Agreement, and Gulf has relied on specific provisions of that document in its argument. However, there is a dispute as to which version of the Settlement Agreement was executed and in effect between the parties. Both Plaintiff and Defendants assert that such an agreement exists, but each relies on a different version.

At the time the Plaintiff's motion for summary judgment was decided, there was only one version before the court. This first version, the "Construx version" was filed with Construx's answer and an affidavit by Mr. Amszynski identifying it as the agreement signed by the parties. Gulf did not challenge this version as the accurate documentation of the parties' agreement until it filed its Notice of Filing while Defendants' motion to alter or amend the grant of summary judgment was pending. That document gave notice of filing the "attached copy of the fully executed Settlement Agreement, dated February 8, 1996. Plaintiff would show unto the Court that the document which Defendants have relied upon is a draft and not the original executed agreement." Attached to the Notice was the "Gulf version." Construx responded to the notice by asserting it was too late in the proceedings for new evidence to be filed and that there were questions concerning the validity and execution of the "Gulf version," including the authority of the surety to modify the prior version of the agreement without authority from the indemnitor.

After these filings, the trial court denied the motion to alter or amend and made no reference to the differing versions of the agreement. Gulf acknowledges that "there is some confusion as to the appropriate version of the Settlement Agreement." It refers to the version it submitted, after the motion to alter and amend the judgment granting summary judgment, as "the fully executed version relied on by Gulf." It refers to the version submitted by Defendants along with their answer as the

---

[5]In addition, Defendants assert the damages, expenses and fees, awarded by the court were excessive, not supported by evidence, and not demonstrated to be reasonable and necessary.

"unexecuted version relied on by Construx." Construx maintains the version it filed is the only one properly in the record, that the two versions are identical with respect to material issues, and that even if they were different, an issue of fact would be created.

The presence in the record before us of two versions of the Settlement Agreement creates issues whose resolution by the trial court is not apparent. Because there are unexplained discrepancies in the execution of each of the versions, and because the two versions differ as to particular relevant provisions, there are questions as to the actual terms agreed to by the parties.

As noted above, Gulf asserts that the "Gulf version" is the executed, original Agreement. The document was executed, however, on behalf of Construx by the same party who signed for Gulf as its Attorney of Record. The attorney's signature on the line for Construx includes the notation "for J. Amszynski per power of attorney." After searching the voluminous technical record, we have discovered a Limited Power of Attorney signed by Mr. Amszynski giving Gulf's attorney certain authority, apparently relating to actions necessary to close the permanent financing on the motel by February 1, 1996. The power of attorney is limited to specific actions and expired at 6:00 p.m. on February 1, 1996. The Notice of Filing indicates the "Gulf version" of the Settlement Agreement was executed on February 8, and the agreement itself states it was executed on that date. There is no testimony or other evidence in the record regarding the execution of the "Gulf version."[6] In fact, its filing was unaccompanied by any affidavit.

The "Construx version" states it was executed February 1, 1996. That version also raises questions about its execution. As filed, the document has two signature pages. Construx's signature block appears on the first, and is signed by Mr. Amszynski as President, not by anyone else using a power of attorney or other permission. The other signature block on that page, for Mr. Patel, is blank. The second signature page, however, is obviously not sequential to the first. It includes text from the body of the agreement above the signature lines and includes signature blocks for all parties. It appears to be a photocopy of the signature page that is contained in the "Gulf version" because the signatures on the first two signature lines are exactly the same as those in the "Gulf version," (meaning that the second signature page includes a signature block for Construx that is signed by the attorney for Construx, "per power of attorney.") However, the third signature block, for the lender, is blank on the "Construx version" and filled in on the "Gulf version."

In view of Contrux's questioning the "Gulf version" as validly executed,[7] we have attempted to find anything in the record to shed light on which version, if either, all parties actually executed.

---

[6]We do not suggest any impropriety in the execution of the document, merely confusion based on the record before us.

[7]We are aware that both versions allow the agreement to be signed "in one or more counterparts or duplicate signature pages" and state, "Any one or more such counterparts or duplicate signature pages may be removed from any one or more original copies of this Agreement and annexed to other counterparts or duplicate signature pages to form a completely executed instrument." Without testimony or other explanation, we are unable to tell which, if either, version is the "completely executed instrument."

6

No testimony or other evidence was taken on this issue, and the trial court did not rule on the correct version. We are unable to do so based on the record before us. This situation creates some difficulties with regard to summary judgment because both parties rely on the agreement or specific provisions of it for their positions. Neither version contains all of those provisions, and we disagree that the versions are identical with respect to terms that are material to the issues before us. We will discuss the issues presented by the two versions in the context of the substantive issues.

## IV. Whether the Settlement Agreement Bars Additional Recovery

Gulf's complaint sought to enforce the obligations undertaken by Defendants in the Agreement of Indemnity. In particular, Gulf alleged it was entitled to reimbursement for payments made and expenses incurred in settlement of claims under the payment bond by virtue of the following provision of the Indemnity Agreement:

> That the Indemnitor will perform all the conditions of each said bond or obligation, and any and all alterations, modifications, renewals, continuations, and extensions thereof, and will at all times indemnify and save the Company [Gulf Insurance] harmless from and against every claim, demand, liability, loss, cost, charge, counsel fee, payable on demand of Surety, whether actually incurred or not, (including fees of special counsel whenever by the Company deemed necessary) expense, suit, order judgment and adjudication whatsoever, and any and all liability therefore, sustained or incurred by the Company by reason of having executed or procured the execution of said bonds or obligations, and will place the Company in funds to meet same before it shall be required to make payment, and in case the Indemnitor requests the Company to join in the prosecution or defense of any legal proceeding, the Indemnitor will, on demand of the Company, place it in funds sufficient to defray all expenses and all judgments that may be rendered therein.

Thus, this lawsuit is based on the Indemnity Agreement, and Gulf's complaint asserts that, under that agreement, Construx and the individual indemnitors are obligated to indemnify and hold Gulf harmless from all liability, loss, damages, and fees of attorneys and other expenses resulting from Gulf's issuance of a payment and performance bond in favor of Construx. The complaint further alleges that Gulf paid claims and made demands on the indemnitors to be held harmless and the indemnitors failed to pay.

Defendants answered and defended on the basis that Gulf's claims are barred by the Settlement Agreement and representations and agreements made in connection with the Settlement Agreement. Defendants assert that all claims between the parties were settled, compromised, or otherwise disposed of by the Settlement Agreement. They argue that, in entering into the agreement, Construx released any claims it might have against the owner and the lender, agreed to give $30,000 to the owner out of the remaining construction loan/construction contract proceeds, and agreed to turn over the rest to Gulf for settlement of claims and distribution in accordance with the agreement. Defendants assert that, absent the Settlement Agreement, Gulf would not have been entitled to the

7

proceeds from which to settle claims. Further, Construx agreed to allow Gulf to negotiate directly with the claimants and to use its expertise to settle the claims.

Defendants further asserted that Gulf was estopped from seeking additional payment from the indemnitors because Gulf had induced Construx to enter into the Settlement Agreement by assurances that Gulf would settle all subcontractor claims for a maximum of $120,000 including attorney fees. Defendants submitted an affidavit and deposition testimony of Mr. Amszynski that he relied upon Gulf's representations that it could settle all subcontractor claims for less than $110,000 and that related attorney fees would amount to less than $10,000. At the time these representations were allegedly made, Gulf had been furnished information from Construx regarding the outstanding claims. Mr. Amszynski states that Gulf's attorney assured him Gulf could "buy down" the claims to under $110,000. According to Defendants, they released all claims they may have had against the owner and the lender and released most of the remainder of the construction loan proceeds to Gulf in reliance upon these representations. This understanding, they assert, explains the Settlement Agreement's disposition of "any savings" if the claims were settled for less than the $135,000 left in loan proceeds released to Gulf.

Construx also relied in part on a letter, written before the Settlement Agreement was executed, from the owner's attorney to Gulf proposing a settlement procedure wherein Gulf would settle all subcontractor claims for not more that $110,000 in the aggregate.[8] This letter was sent two days after that attorney was provided by Gulf with a list of outstanding claims, along with the amounts Construx claimed were owed. The total amount claimed by subcontractors was $178,142.11, and Construx claimed that only $100,762.24 was actually owed.

Defendants argue that they released all claims they may have had against the owner, agreed to allow Gulf to settle claims using the remaining contract or loan proceeds, and gave up claim to most of the those proceeds, agreeing to give the owner $30,000, and receiving only 30% of any savings from settlement of the claims for less than $135,000, in reliance upon Gulf's promise that it would settle the claims for less than $120,000, including attorney fees.

Defendants also asserted that Construx's release of the remaining proceeds from the construction loan, along with other consideration evidenced by the Settlement Agreement, constituted an accord and satisfaction of any claims by Gulf against Construx or the individual indemnitors. They assert that Construx provided Gulf with the remaining construction loan proceeds (a material consideration to which Gulf would not have otherwise been entitled) in exchange for Gulf using its expertise to settle all subcontractor claims for a total of $120,000. Both parties, Defendants assert, intended this and other consideration to act as an extinction of Construx's or the individual indemnitors' obligation to reimburse Gulf for subcontractor payments and attorney fees beyond the $135,000 given to Gulf for such purposes under the Settlement Agreement. Construx gave up its

_____

[8]The owner Mr. Patel, apparently had an interest in the amount paid to subcontractors because he ended up negotiating a provision in the agreement to provide him the greater portion of any savings between the settlement amount and the construction contract amount (or remaining loan proceeds).

claim to most of the remaining loan/contract proceeds, and Gulf was provided a pool of money, not its own, from which to make payments to claimants. Thus, Defendants assert, the acceptance by Gulf of the loan proceeds and execution of the Settlement Agreement constituted an accord and satisfaction, barring Gulf from asserting claims against Defendants for further reimbursement.

In response, Gulf contends that the Settlement Agreement does not expressly limit the amounts Gulf could use to settle payment bond claims or attorney fees; that the agreement contains no arrangement as described by Defendants; but that the agreement expressly preserves Gulf's rights under its payment bond. Gulf further asserts that the Settlement Agreement does not modify the rights and obligations of the parties to the payment bond or the Indemnity Agreement. In essence, Gulf relies on specific language of the Settlement Agreement and asserts that "the document speaks for itself."

Gulf argues that the Settlement Agreement is unambiguous, relying on several provisions of the agreement. Gulf insists that the Settlement Agreement itself does not include an agreement by Gulf to limit settlement of subcontractor claims and attorney fees to $135,000, but that Gulf merely agreed to pay any savings, if the claims were settled for under $135,000, to the owner and Construx.[9] Gulf also relies on the provision in which Gulf agreed to continue to honor its obligations to pay the claims of subcontractors and suppliers under the payment bond. Thirdly, Gulf relies on a provision which states, "[t]his Settlement Agreement shall not be deemed to be a waiver of any rights, remedies, and/or defenses which the Surety may have under its Payment Bond or otherwise." Finally, Gulf relies on a provision appearing only in the "Gulf version" wherein Construx specifically ratifies the Indemnity Agreement.

Gulf did not dispute the factual allegations of Construx regarding the parties' intent that the Settlement Agreement extinguish all claims under the Indemnity Agreement. Instead, Gulf relied on the document and argued that Defendants must rely on parol evidence to create their issue, and that parol evidence is not admissible when the parties' intentions can be found in the contract itself. Citing *Freeze v. Home Fed. Sav. & Loan Ass'n. of Manchester*, 623 S.W.2d 109, 112 (Tenn. Ct. App. 1981) (citations omitted), Gulf argues that Mr. Amszynski's testimony, as well as the above described letter, is parol evidence, which cannot be used "to vary, add to, detract from, or contradict the terms of a document, or to modify its legal import." Similarly, Gulf asserts that Defendants must rely on parol evidence to make its estoppel argument because the Settlement Agreement does not include any provision expressly limiting the amount which Gulf could incur in payment of subcontractor claims. Relying on *Womble v. Dortch*, 1984 Tenn. App. LEXIS 3268 ( Nov. 1, 1984), Gulf asserts that Construx cannot defeat summary judgment by relying on parol evidence where a claim predicated on estoppel is grounded upon oral promises made prior to the written contract that integrated the parties' agreement.

A. The Provisions of the Agreement

_____

[9]The "Gulf version" would give Construx's share of any savings to Gulf.

9

The primary dispute is whether the Settlement Agreement bars, or evidences the parties' intent that it bar, any additional liability under the Indemnity Agreement. As a general rule, the interpretation of a clear and unambiguous contract is a question of law for the court and the court's role is to interpret the contract according to its plain terms. *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995) (citing *Malone & Hyde Food Serv. v. Parson*, 642 S.W.2d 157, 159 (Tenn. App. 1982)); *Estate of Haynes v. Braden*, 835 S.W.2d 19, 21 (Tenn. Ct. App. 1992) (citations omitted); *Woodmen of the World Life Ins. Soc'y v. Bank of Waynesboro*, 826 S.W.2d 915, 918 (Tenn. Ct. App. 1991) (citing 88 C.J.S. *Trial* § 217 (1955)); *Krantz v. Overfelt's Discount Realty*, Docket No. 01A01-9311-CH-00501, 1994 WL 164091 at *4 (Tenn. Ct. App. May 4, 1994) (no Tenn. R. App. P. 11 application filed) (citing *Strickland v. City of Lawrenceberg*, 611 S.W.2d 832 (Tenn. App. 1980)). "It is incumbent upon this court to enforce contracts according to their plain terms." *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995) (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)).

Both parties have relied on the Settlement Agreement, although they apparently do not agree on the terms of such agreement. Both versions contain the following language:

> WHEREAS, there exists several outstanding issues for Construx, Patel, the[10] First Tennessee Bank and Gulf to resolve: namely, (i) the release of outstanding mechanics, materialmen and suppliers' lien, (ii) the resolution of actions to enforce mechanics lien arising out of the construction, (iii) reimbursements claimed by Patel for payments made on behalf of Construx under the construction contract, (vi) [sic] such other claims or defenses Construx, Patel, First Tennessee Bank and Gulf might have under the terms of the Payment Bond, Performance Bond and contract, (vii) such other claims as Gulf or Construx may have against Patel and or First Tennessee Bank. To insure the proper resolution of the outstanding issues referred to herein and without enlarging or expanding Surety's obligations under the Payment and Performance bonds and without waiving the penal sum set forth in the Payment and Performance bonds and in order to limit the potential liability of Construx in the event Patel is unable to close the East Ridge loan on or before February 1, 1996 since the East Ridge commitment to make the loan expires that date, Construx, Patel, First Tennessee Bank and Gulf have agreed to enter into this Agreement to resolve the issues herein and to disburse the remaining construction loan proceeds presently held by First Tennessee Bank;

> WHEREAS, the parties acknowledge that remaining contract proceeds are in the amount of $165,000;[11]

---

[10]The "Construx version" includes this "the" and the "Gulf version" does not. Otherwise, the provisions are identical, including the misnumbering of items.

[11]The "Gulf version" reflects this figure, in typewritten form, as $164,640.65.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Patel and First Tennessee Bank agree to accept the project[12] and will retain $30,000 of remaining contract proceeds to be disbursed directly to Patel upon closing.

2. Construx and the Surety[13] agree to accept remaining contract proceeds subject to the conditions set forth herein.

4.[14] The Bank hereby agrees to disburse to the Surety the sum of $135,000.00[15] of remaining contract proceeds subject to the conditions set forth herein.

The provision of perhaps greatest significance to the issues in this appeal appears as paragraph 6 of the "Construx version" and as paragraph 4 of the "Gulf version." We begin with the "Construx version."

Gulf will utilize remaining contract proceeds in the amount of $135,000.00 to discharge such obligations as it may have pursuant to its Payment Bond to suppliers and subcontractors in direct privity of contract with Construx. The Surety will continue to honor such obligations as it may have pursuant to its Payment Bond to third party suppliers and subcontractors who have direct contractual privity with Construx. This Settlement Agreement shall not be deemed to be a waiver of any rights, remedies and/or defenses which the Surety may have under its Payment Bond or otherwise. This Settlement Agreement shall not be deemed to in any way expand Gulf's obligations and/or liabilities under the Payment Bond. In the event that settlement of the aggregate amount of outstanding valid Payment Bond claims is less than $135,000.00, then any savings shall be divided between Patel and Construx with Patel receiving 70% of the total sums saved.

In the "Gulf version," the figure $135,000 has been corrected, by hand, to $134,640.65, and the word "Gulf" has been substituted, by typewritten change, for the words "the Surety." The most

---

[12]The "Construx version" included the phrase "as is" at this point.

[13]The "Gulf version" substitutes "Gulf" for "the Surety."

[14]The "Construx version" had another provision preceding this one, numbered 3 in that version, which is not relevant to the issues under discussion. That provision does not appear as paragraph 3 in the "Gulf version."

[15]On the "Gulf version," the typed $135,000.00 has been marked out, and the figure $134,640.65 has been handwritten in its place, and the change is initialed by one party "GRC." In addition, in the "Gulf version," the words "First Tennessee Bank and Patel" are substituted for the word "Bank."

significant difference, however, is the addition in the "Gulf version" of the following sentence at the end of the provision: "Construx agrees that any savings due it shall be assigned to and be the property of Gulf."

In addition, the "Gulf version" includes the following provision, which is absent from the "Construx version:" "Construx does hereby ratify and confirm that the terms of any General Agreement of Indemnity remain in full force and effect."

## B. Genuine Issue

Gulf argues that Defendants' assertions that the Settlement Agreement foreclosed additional claims under the Indemnity Agreement, that Gulf is estopped to assert such claims because Defendants were induced to enter into the Settlement Agreement on the understanding the remaining loan proceeds would cover all claims and expenses relating to settlement of subcontractor claims, and that the Settlement Agreement is an accord and satisfaction because of the same understandings, are all based on parol evidence which cannot be considered if the contract is unambiguous. Gulf relies on the agreement's provision that "This Settlement Agreement shall not be deemed to in any way expand Gulf's obligations and/or liabilities under the Payment Bond." This provision appears in both versions of the Settlement Agreement in the record. Gulf also relies on the provision appearing only in the "Gulf version" ratifying the Indemnity Agreement.

When a contract is unambiguous, "[p]arol evidence cannot be received to vary, add to, detract from, or contradict the terms of a document, or to modify its legal import." *Krantz v. Overfelt's Discount Realty*, 1994 WL 164091 at *4 (citing *Freeze v. Home Fed. Sav. & Loan Ass'n of Manchester*, 623 S.W.2d at 112); *Renaissance Fin. Serv., Inc. v. Billbury*, Docket No. 03A01-9710-CH-00462, 1998 WL 430554 at *4 (Tenn. Ct. App. July 31, 1998) (no Tenn. R. App. P. 11 application filed). However,

> [p]arol evidence has been held admissible where: (1) the evidence tends to establish an independent collateral agreement that does not conflict with the original writing; (2) to show an agreement made subsequent to the original document; (3) to show the inducement for entering into the written contract; (4) where fraudulent representations have occurred; or (5) where plaintiff relies upon the doctrine of estoppel. In addition, parol evidence is admissible to uncover and reveal the true intentions of the parties in the event of an ambiguity in the contract. However, when no ambiguity exists, there is no occasion to entertain parol evidence, or to vary from the plain meaning of the contract.

*Krantz v. Overfelt's Discount Realty*, 1994 WL 164091 at *4 (citations omitted).

12

As this court has stated:

> The parol evidence rule is a rule of substantive law intended to protect the integrity of written contracts. Since the courts should not look beyond a written contract when its terms are clear, the parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.
>
> The rule appears to be quite all-encompassing. However, the courts have been reluctant to apply it mechanically and have now recognized that it has numerous exceptions and limitations. Thus, the rule does not prevent using extraneous evidence to prove the existence of an agreement made after an earlier written agreement, or to prove the existence of an independent or collateral agreement not in conflict with a written contract. In each of these circumstances, the courts have conceived that the parol evidence is not being used to vary the written contract but rather to prove the existence of another, separate contract.
>
> The courts have also recognized certain circumstances that permit contracting parties to vary or circumvent the plain terms of their written contract. Thus, the parol evidence rule does not prevent using extraneous evidence to prove that a written contract does not correctly embody the parties' agreement, or to prove estoppel or waiver.

*GRW Enterprises, Inc. v. Davis*, 797 S.W.2d 606, 610-11 (Tenn. Ct. App. 1990) (citations omitted).

In *GRW Enterprises*, this court determined that testimony regarding the parties' negotiations prior to execution of a written option agreement was admissible to prove "that the final version of the written option did not accurately reflect the parties' agreement and to prove that [the defendant] should be estopped from relying" on the expiration date appearing in the written agreement. *GRW Enterprises*, 797 S.W.2d at 613.

*Womble v. Dortch,* relied upon by Gulf, is not inapposite. In that case, this court determined that parol evidence of an oral agreement which the Plaintiff alleged induced him to enter into a written agreement would not be admissible at trial because that evidence directly conflicted with the terms of the written agreement. 1984 Tenn. App. LEXIS 3268 at *6. The written agreement stated that it could be terminated by either party upon thirty days notice. *Id.* at *2. The Plaintiff alleged he had been promised he would have employment, through the written lease agreement, for at least five years. *Id.* Thus, there was a direct contradiction between the alleged oral promise and the terms of the written agreement, and that direct contradiction was determinative. *Womble* itself relies on other authority that indicates that exclusion of parol evidence is not required where such is a aid to the meaning of the contract and not at odds with a later integrating written agreement. *Id.* at *3-6.

13

It is well-settled that where the contract is ambiguous, parol evidence is allowed to explain the written agreement. *Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn. 1985). In *Jones*, the court allowed parol evidence to explain the intention of the parties as to the meaning of a provision requiring one party to assume responsibility of "all known . . . accounts amounting to an amount in excess of $13,000.00 as per attached list . . ." *Id.* The court found that the agreement was ambiguous with respect to which party was responsible for known debts which were not included on the list. *Id.* at 886-87. "Being subject to two reasonable interpretations, the language is ambiguous," and parol evidence was properly considered. *Id.* at 887.

The parties' versions of the Settlement Agreement herein both include the provision stating the purposes of the settlement, which include "(i) the release of outstanding mechanics, materialmen and suppliers' lien, (ii) the resolution of actions to enforce mechanics lien arising out of the construction, . . . (vi) such other claims or defenses Construx, Patel, First Tennessee Bank and Gulf might have under the terms of the Payment Bond, Performance Bond and contract." The agreement envisions that the total settlement of claims may be less than the amount given to Gulf to settle such claims, making specific provision for the disbursement of such "savings." On the other hand, the agreement is silent as to what happens if the total amount paid in settlement of the claims exceeds the amount given to Gulf for the purpose of settlement.

Gulf asserts that the provision stating, "[t]his Settlement Agreement shall not be deemed to in any way expand Gulf's obligations and/or liabilities under the Payment Bond" precludes any interpretation that the Settlement Agreement extinguished its rights to reimbursement from the indemnitors. We do not interpret Defendants' arguments as affecting Gulf's obligations or liabilities under the payment bond. Gulf was always obligated to perform in accordance with that bond, and those obligations ran to the subcontractors. In any event, Gulf brought this lawsuit to enforce the obligations under the Indemnity Agreement.

The issue of whether the Settlement Agreement settled Defendants' obligations under the Indemnity Agreement is unaddressed by the "Construx version" of the agreement. That version is silent as to any cancellation or affirmance of the Indemnity Agreement. We conclude, reading that entire document as a whole, that the "Construx version" of the agreement is subject to two reasonable interpretations regarding liability for any settlement amounts and expenses in excess of the $135,000 given to Gulf, and, therefore, subject to two reasonable interpretations regarding the indemnitors' continuing liability under the Indemnity Agreement.

In the trial court and in this court, Gulf has relied on the provision which states, "Construx does hereby ratify and confirm that the terms of any General Agreement of Indemnity remain in full force and effect." We do not disagree that such a provision removes some ambiguity regarding whether the Indemnity Agreement's obligations were extinguished by the Settlement Agreement. At the time Gulf was relying on this provision in the trial court to support its summary judgment motion, however, that provision did not appear in the only version of the Settlement Agreement which had been presented to the court. While Gulf attempted to correct this oversight by a late filing of its own version of the agreement, that filing creates fact issues of its own. In addition, if the "Gulf

version" was not the final and fully executed version, about which a factual issue exists, the presence of the ratifying provision in the later draft could have implications for the interpretation of its absence from the "Construx version." This discrepancy alone creates issues of fact regarding the parties' intent on a primary issue. The two versions create greater ambiguity as to the terms of the agreement as well as to the intent of the parties.

In addition to the ambiguity issue, Defendants have also asserted the defense of estoppel. The principle of estoppel is based on the premise that "one who has orally induced a changed performance by the other should not escape payment therefor." *GRW Enterprises*, 797 S.W.2d at 611. In discussing the affirmative defense of estoppel, this court has stated:

> [W]hen one man by his promise induces another to change his situation, repudiation of the promise would amount to a fraud. Where one makes a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and where such promise does in fact induce such action or forbearance, it is binding if injustice can be avoided only by enforcement of the promise.

*Stones River Util., Inc. v. Metropolitan Gov't of Nashville, Davidson County*, 981 S.W.2d 175, 177 (Tenn. Ct. App. 1998) (quoting *Foster & Creighton Co. v. Wilson Contracting*, 579 S.W.2d 422, 427 (Tenn. Ct. App. 1979)).

Therefore, we conclude that parol evidence may be considered because the Settlement Agreement, or the two versions of the Settlement Agreement, are not unambiguous on the issue of whether it settled all claims between the parties. In addition, parol evidence may be considered where the issue of estoppel is sufficiently raised.

In response to the motion for summary judgment, Defendants alleged facts regarding the inducement for them to enter into the Settlement Agreement as well as facts regarding the interpretation of the agreement. Gulf did not dispute these factual allegations, and provided another version of the agreement, creating additional issues of material fact.

Therefore, Defendants have sufficiently put at issue the breadth and effect of the Settlement Agreement and the intent of the parties in executing it. At a minimum, we find that there is a material factual dispute as to whether Gulf settled its claims against Defendants by executing the Settlement Agreement, or whether Gulf is estopped to assert otherwise, thereby limiting the amount of Defendants' liability for payment of subcontractors claims and attorney fees incurred by Gulf. The basic issue which must be resolved before that issue can be addressed is what the parties actually agreed to, and there is a genuine factual dispute regarding that material issue also. Therefore, summary judgment was inappropriate as a matter of law.

15

## V. Settlement of Subcontractor Claims

Defendants contend that Gulf settled claims at inflated rates, to which Construx objected: specifically, that Gulf settled claims over Defendants' protest and in spite of Construx having provided records in defense of its position that some subcontractors were not entitled to monies requested. In fact, Construx claims that some subcontractors were paid even more than the subcontractors claimed were due. In essence, Defendants, in their answer and on appeal, have contended that Gulf paid claims that were disputed or invalid and in excess of what claimants were entitled to. In making such payments, Defendants assert, Gulf was acting beyond the terms of the agreements between the parties and expended its own funds for which it is not entitled to reimbursement.

Specifically, Defendants assert: (1) that Apex was paid $3,700.98 more than claimed by Apex and over the contract price for fixtures; (2) Lee Plumbing was paid $10,135.50 more than the contract provided for; (3) Northview Glass was paid for bathroom fixtures never furnished by Northview because Construx furnished the fixtures and, therefore, was overpaid $13,000 and that Gulf was provided documentation of the credit for the fixtures; (4) Ramco Electric was paid $750 more for work done in the pool area for the owner, and there was no contract between Ramco and Construx; (5) Roger Patel was paid $2,000 because he indicated he was unhappy with the towel rack he picked out and was paid "to go away;" (6) Carter Heating and Air was paid $3,691.25 in excess of the contract price; (7) Grade Technologies was paid $286.25 more than it was due; and (8) Rib Roof was paid $19,370.12 more than it was entitled to. Also, Construx asserted that Gulf did not take into account back charges and the fact that Rib Roof had delayed the project and cost Construx $300 per day in liquidated damages, even though Gulf was made aware of this prior to payment. Additionally, Construx asserted the work was defective and Construx was required to repair it. In sum, Construx asserts that Gulf was provided with documentation and/or contracts that indicated the amounts were wrong, but that Gulf paid the higher amounts anyway.

Included in Defendants' evidence is a letter from Gulf's attorney to the owner's attorney prior to the Settlement Agreement in which Gulf lists outstanding payment bond claims, reflecting the amount claimed by each claimant and the amount Construx contended was due. The total requested from the claimants was $178,142.11, and Construx estimated the amounts due at $100,762.24. The total amount actually paid out in claims was $177,228.39.

On the other hand, Gulf contends that the claims were not overpaid and, in opposition to Construx's allegations, asserted that extensive investigations were done on the disputed claims to verify contracts, amounts owed, and materials delivered and used at the site. Also, affidavits and releases were obtained prior to payment. For example, Gulf asserts that Construx did not take into account the following: Apex had a judgment in Cobb County State Court on April 24, 1996 for $13,749.75 and provided an accounting of such; Gulf obtained sworn testimony of the amount and delivery slips to verify supplies delivered; negotiations settled the claims for $12,471.63. Lee's Plumbing's original claim included the Apex claim of $3,977.02 and was reduced once the Apex claim was settled. The contract submitted by Construx was unsigned and in the amount of $67,000.

16

Lee signed the contract for $77,000 and produced pay slips with $77,000 on them in which Defendant had signed. Additionally, there was a dispute on a charge order in the amount of $1,200. Also, Lee filed a lien in which Defendant was notified by letter of February 28, 1996. Construx did nothing in response to this and, therefore, Gulf had to defend with an answer and discovery. In response to the Northview Glass claim, the contract did not include toilet accessories which were disputed for credit of $13,246. However, Gulf obtained a secured sworn statement, documents and interviews to support payment of the claim. Regarding the Ramco claim, Construx did not consider a change order for wiring and installation for parking lights and two entrance signs totaling $2,538.89. After a thorough investigation, it was determined that the claim of Ramco totaled $14,942.48 and was settled for $11,096.70. Next, Rib Roof made a claim for $36,135.96. Defendants claim that liquidated damages were not considered in settlement of this claim. However, liquidated damages were a claim by the owner against Construx and were settled in the release of funds and with the Settlement Agreement. Additionally, the owner was paid because 46 of 51 racks had failed in the rooms. Gulf asserts this was a warranty claim due to faulty installation.

Obviously, there are many factual disputes regarding the amounts actually due a number of subcontractors and claimants. The question, for our purposes, is whether any of these disputes are material; that is, whether those factual disputes must be decided in order to resolve the substantive claim by Gulf or the defense asserted by Defendants. Defendants assert that the surety, Gulf, is not entitled to recover from the indemnitors for any claims where no liability existed or where settlement was not made reasonably and in good faith.

Gulf does not dispute that basic statement of the law, merely phrasing it a little differently: a surety on a payment bond and Indemnity Agreement may recover from its principal and indemnitors if it has acted reasonably and in good faith. Gulf relies on the following provisions of the Indemnity Agreement, which Gulf asserts remains in full force and effect, notwithstanding the execution of the Settlement Agreement:

> That the Indemnitor . . . will at all times indemnify and save the Company [Gulf] harmless from and against every claim, demand, liability, loss, cost, charge, counsel fee, payable on demand of Surety, whether actually incurred or not, (including fees of special counsel whenever by the Company deemed necessary) expense, suit, order judgment and adjudication whatsoever, and any and all liability therefore, sustained or incurred by the Company by reason of having executed or procured the execution of said bonds or obligations, and will place the Company in funds to meet same before it shall be required to make payment, and in case the Indemnitor requests the Company to join in the prosecution or defense of any legal proceeding, the Indemnitor will, on demand of the Company, place it in funds sufficient to defray all expenses and all judgments that may be rendered therein.
>
> *****
>
> That the Company [Gulf] shall have the right to pay, settle or compromise any expense, claim or charge of the character enumerated in this agreement, and the

voucher or other evidence of such payment shall be prima facie evidence of the propriety thereof and of the indemnitor's liability therefore to [Gulf].

Gulf asserts that the law is well-settled that provisions of this nature "are valid, enforceable, and not contrary to public policy in Tennessee," citing *Safeco Ins. Co. of America v. Criterion Inv. Corp.*, 732 F. Supp. 834, 841 (E.D. Tenn. 1989), which in turn relied upon a 1948 opinion of this court, *National Sur. Corp. v. Buckles*, 219 S.W.2d 207 (Tenn. Ct. App. 1948). The relevant question, however, is not whether the provision is enforceable, but how it is to be interpreted in such enforcement.

We begin with the language that evidence of payment by Gulf of claims is "prima facie evidence of the propriety" of such payment. Prima facie evidence establishes a fact as presumptively true unless disproved by evidence to the contrary. BLACK'S LAW DICTIONARY 1190 (6th ed. 1990); *Tennessee Farmers Mut. Ins. Co. v. Moore*, 958 S.W.2d 759, 765 (Tenn. Ct. App. 1997) (a statute making certain evidence prima facie evidence of other facts creates a presumption which can be rebutted); *Hunter v. Burke*, 958 S.W.2d 751, 755 (Tenn. Ct. App. 1987) (prima facie evidence can clearly be rebutted by countervailing proof). Thus, the language of the agreement itself recognizes that other proof may be considered to show that a payment was not proper or that the indemnitor is not liable for it.

Although Gulf appears to concede that the proper test is whether the surety acted reasonably and in good faith in settlement of claims, it argues for a restrictive and subjective interpretation of the term "good faith"[16] and disregards the reasonableness requirement. Gulf relies extensively on the *Safeco* case, pointing out the similarity of the language of the Indemnity Agreement at issue in *Safeco* and the one involved in this case.[17] Gulf directs us to that portion of the *Safeco* opinion which finds that the surety's "duty under the Indemnity Agreement which is the basis of this action was simply to determine in good faith whether any claim under the bond issued for [the principals] should be paid. Furthermore, the Indemnity Agreement made any such good faith determination, at least from the indemnitors' viewpoint, 'final and conclusive.'" *Safeco*, 732 F. Supp. at 841. As noted above, the language in the agreement herein makes such payment "prima facie evidence of the propriety thereof and of the indemnitor's liability therefore."

In *Safeco* the federal court applied its interpretation of Tennessee law regarding the standard to be applied to a surety's actions in paying claims for which it seeks reimbursement from an

---

[16]For example, Gulf argues that allegations of lack of diligence in investigation of claims does not make out a claim of bad faith, and that "improper motive is . . . an essential element of bad faith," again relying on the *Safeco* opinion. Gulf also asserts that the mere possibility that defenses existed to some claims is not evidence of bad faith and that settlement over the objection of the principal is also not sufficient to establish bad faith settlement.

[17]We note, however, that the agreement in *Safeco* gave the surety "the exclusive right . . . to determine in good faith whether any claim . . . shall be paid." 732 F. Supp. at 836.

indemnitor. *Id.* The court ruled after a trial, not on a summary judgment motion, and had the following observations about a standard based on good faith:

> What is "good faith" depends, it is obvious, upon the facts and circumstances of each case. This standard requires less of an actor than the standard of reasonableness under the circumstances which is central to the law of negligence. *See e.g.* Tennessee Code Annotated § 47-1-201 (19): "'Good faith' means honesty in fact in the conduct or transaction concerned."

*Id.* (citations omitted).

Generally, there are two recognized defenses an indemnitor can raise when a surety seeks reimbursement for claims settled over the principal's protest: (1) that the surety did not settle in good faith or (2) that the surety did not act in a reasonable and prudent manner. John Hinchey, *Surety's Performance Over Protest of Principal: Considerations and Risks*, 22 Tort & Ins. L.J. 133, 148 (1986). Jurisdictions vary in whether only the lack of good faith defense is available or whether the surety is also held to a reasonableness standard. *Id.*

The *Safeco* court recognized that *Central Towers Apartments, Inc. v. Martin*, 61 Tenn. App. 244, 453 S.W.2d 789 (Tenn. Ct. App. 1969), could be interpreted as requiring the application of a reasonableness standard in addition to a finding of good faith. 732 F. Supp. at 842. In *Central Towers*, the surety sought reimbursement for attorney fees and expenses incurred by it in defending a lawsuit by the owner of a construction project. The lawsuit was brought against the contractor, surety, architect, subcontractors, and an equipment manufacturer, and the contractor was already defending the action. *Central Towers*, 61 Tenn. App. at 247-48, 453 S.W.2d at 791. The Indemnity Agreement in that case provided that indemnitors would hold the surety harmless from any and all claims, liability, cost, charge, counsel fee, and expense. *Id.* at 61 Tenn. App. at 253-54, 453 S.W.2d at 793. It further provided, "liability hereunder shall extend to any and all disbursements made by the Surety in good faith under the belief it was liable for the amount so disbursed, or that it was necessary or expedient to make such disbursements, whether such liability, necessity or expediency existed or not." *Id.* at 61 Tenn. App. at 254, 453 S.W.2d at 793-94. This court determined that no conflict of interest existed between the contractor and the surety in the lawsuit brought by the owner and determined the issue to be "when, or under what circumstances, an indemnified surety may incur attorney's fees and litigation expense at the cost of the contractor indemnitor when the Indemnity Agreement gives the surety the right to incur such expenses." *Id.* at 61 Tenn. App. at 263, 453 S.W.2d at 798. In answer to that question, this court stated:

> . . . the liability of the principal for the attorney fees and expenses thus incurred by the surety depends upon whether, under all the facts of the case, it was reasonably necessary for the surety to so act in its own defense, and whether the surety acted in good faith toward the principal . . .

19

and it is necessary in each case for the court to look to the evidence to determine the question of good faith and reasonable necessity of the action on the part of the surety in creating these expenses which it seeks to recover of the principal.

*Id*. at 61 Tenn. App. at 267, 453 S.W.2d at 799. In addition, the court listed a number of factors bearing on the reasonable necessity and good faith of the surety in hiring its own counsel. Because there had been a full trial of the issues, the court was able to apply the factors it deemed relevant to the facts developed in the record. Although *Central Towers* involved a claim for litigation expenses, we think its reasoning applies to a request for reimbursement for amounts paid in settlement as well as for expenses incurred in settlement or litigation where the Indemnity Agreement gives the right to make such settlements or incur such expenses.[18]

Although the standard to be applied was not a debated issue in *Feld Truck Leasing v. ABC Transnational Transp.*, 681 S.W.2d 554, 556, (Tenn. Ct. App. 1984) in that case, this court found, under an express agreement, that the indemnitee was entitled to reimbursement for settlements where the indemnitor left the claims to be handled by the indemnitee, making the payments not "voluntary," and where "the trial court expressly found that the settlements made . . . were *reasonable*." (emphasis added).

We agree with the parties that Tennessee law requires that, in order for a surety to recover under an indemnity agreement, the surety must act both reasonably and in good faith. *Feld Truck Leasing*, 681 S.W.2d at 555-56; *Central Towers*, 61 Tenn. App. at 267, 453 S.W.2d at 799-800. However, we are not convinced that the reasonableness requirement adds a higher standard than the good faith requirement as good faith has been interpreted in a contractual or commercial context. Even without the reasonableness requirement, the requirement that the surety act in good faith in settling claims under its contractual ability to do so involves consideration of a broader range of factors than Gulf would have us use.

An indemnity agreement is subject to the general law of contracts, and every contract contains an implied obligation of good faith and fair dealing in its performance and enforcement. 2 PERILLO AND BENDER, CORBIN ON CONTRACTS § 5.27 at 139 (rev. ed. 1995). Thus,

[t]here is no doubt that, in performance of its duty to indemnify the insured, the insurer is bound to exercise "good faith" and to act fairly in the interest of the insured. Such an undertaking is said to be "implied," it is certainly required of an indemnitor by the law, whether it is "implied in fact" or not. This is especially

---

[18]The *Safeco* court also determined that the *Central Towers* holding appeared to apply only to a situation in which the principal is cooperating to keep the surety from exposure to risk on the bond. *Safeco*, 732 F. Supp. at 842. That court found that Defendants in *Safeco* had failed to deal with the claimants under the bond after the surety's repeated requests that it do so. "It is precisely this failure of Criterion to communicate with the broker's surety bond claimants which made the plaintiff's conduct reasonable." *Id*. Obviously, in the case before us, Construx continued to provide Gulf with records and documentation and to voice its objection to the particulars of specific settlements.

applicable to an insurer who has promised to defend suits and who has reserved the power to "settle" claims asserted against the insured.

3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 572A at 355 (1960).

In defining good faith, courts have sometimes applied the Uniform Commercial Code's definition to transactions not covered by the UCC. Specifically, UCC § 1-201(19) defines good faith subjectively as "honesty in fact in the conduct or transaction concerned."[19] PETER A. ALCES, THE LAW OF SURETYSHIP AND GUARANTY ¶ 3.01[2][a][i] (1997). However, as has been explained,

> The Second Restatement of Contracts defines good faith in essentially the same terms as the UCC. One portion of the comment to Restatement of Contracts § 205 explains that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." The invocation of community standards of reasonableness suggests good faith necessarily incorporates an objective, almost tortlike measure, not withstanding the ostensibly subjective ("honesty in fact") language of the Article 1 definition. And the Restatement of Contracts comment confirms that a reasonableness analysis is appropriate.

Id. ¶ 3.01[2][a][ii].

Our Supreme Court adopted a similar approach in defining the scope of the good faith requirement for acceleration of a debt when the creditor deems itself insecure. Interpreting the UCC's provision that the power to so accelerate payments must be construed as giving the creditor "the power to do so only if he in good faith believes that the prospect of payment . . . is impaired," the Court stated:

> The good faith requirement is independent of particular privileges and duties that arise under the code or under the contracts. It imposes "an honest intention to abstain from taking any unconscious advantage of another, even through the forms and technicalities of the law."

Lane v. John Deere Co., 767 S.W.2d 138, 139, 140 (Tenn. 1989) (citations omitted). The Court listed a number of circumstances which could be relevant to a determination of good faith in the transaction involved, Id. at 140-41, and concluded that the record contained sufficient material evidence to support the jury's verdict that the creditor did not act in good faith in accelerating payment. Id. at 142.

---

[19]For example, in Safeco the court found relevant the statutory definition of good faith found in Tennessee's adoption of the Uniform Commercial Code, Tenn. Code Ann. § 47-1-201(19).

The Court held that because the creditor must act out of an honest belief that the other party's ability to perform has deteriorated and must not use the acceleration clause as an instrument of abuse, "[a]ny evidence that the belief was not rational or that the party accelerating the debt took unconscientious advantage of the other or resorted to this severe remedy for other reasons is material." *Id*. at 142.

The Supreme Court has addressed the meaning of good faith in another commercial context, and "accepted that bad faith can be defined as a knowing or reckless disregard of a customer's rights." *Glazer v. First Am. Nat. Bank*, 930 S.W.2d 546, 549 (Tenn. 1996). In that case, a bank's customer sued the bank for, among other things, refusing to provide records regarding forged checks payable to him. In discussing the appropriate definition of good faith, the Court stated:

> [W]e first note that [the bank] is correct that 47-1-201(19) does make a party's "good faith" dependent upon its "honesty," and that this Court, in *McConnico, supra*, did equate "bad faith" with "dishonesty." This does not end the inquiry, however, for the word "honesty," which is not defined in the code, is susceptible to more than one definition. For example, *Webster's* defines "honesty" as "freedom from subterfuge or duplicity," a definition that supports the bank's argument. *Webster's Third International Dictionary* 1086 (G.C. Merriam Co. 1976). However, *Webster's* also defines the term as "faimess and straightforwardness of conduct," *Id*., which tends to support Dr. Glazer's argument. Moreover, several courts have concluded that the term "bad faith" encompasses a wider range of actions than outright deception or untruthfulness. *Shearson Lehman Bros*., *Inc. v. Wasatch Bank*, 788 F.Supp. 1184, 1196 (D. Utah 1992); *Kraftsman Container Corp. v. United Counties Trust Co.*, 169 N.J.Super. 488, 404 A.2d 1288, 1293 (1979); *Taylor v. Citizens Bank of Albany*, 290 Ky. 149, 160 S.W.2d 639, 641 (1942). Taking into consideration the various meanings of the word "honesty," and the conclusions of other courts, we accept the definition proffered by Dr. Glazer [a knowing or reckless disregard of a customer's rights.]

*Id.* at 549-50.

Good faith, or the lack thereof, as well as reasonableness, should be determined in the context of the specific factual situation involved. "What is good faith depends, it is obvious, upon the facts and circumstances of each case." *Safeco*, 732 F. Supp. at 841; *see also Lane v. John Deere Co.*, 767 S.W.2d at 142 (any evidence tending to show an other than good faith basis for the action is material); *Central Towers*, 61 Tenn. App. at 267, 453 S.W.2d at 799 (court must look to all the facts of the case to detemine whether it was reasonably necessary for the surety to so act in its own defense, and whether the surety acted in good faith toward the principal).

Similarly, as a general rule, "[t]he question of reasonableness is a factual question to be determined by the trier of fact and, if there is a dispute, summary judgment would not be proper." *Educational Serv. Placement, Inc. v. Watts*, 789 S.W.2d 902, 904-05 (Tenn. Ct. App. 1989)

(deciding whether buyer made reasonable efforts to obtain financing). For example, this court has previously recognized that the reasonableness of a plaintiff's reliance on an alleged misrepresentation is generally a question of fact inappropriate for summary judgment. *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996). Also, "the reasonableness of the plaintiff's actions in making the demand is a factual determination for the trial court to make at trial, not on summary judgment." *Frye v. Postal Employees Credit Union*, 713 S.W.2d 324, 326-27 (Tenn. Ct. App. 1986).

This is not to say that summary judgment is never available when the question of good faith or reasonableness is a determinative issue. However, summary judgment is warranted only when, taking the evidence of the non-moving party as true, viewing that evidence in the light most favorable to the non-moving party, and drawing all reasonable inference therefrom in favor of the non-movant, there is no genuine issue of material fact. If there is any doubt whether a genuine issue exists, summary judgment must be denied.

Defendants presented deposition and affidavit testimony as to the reasons the overpayments were unreasonable and to show that Gulf knew this information prior to payment of the claims. Specifically, Mr. Amszynski indicated that Gulf did not take into account the setoff, credits, back charges, contract terms, etc., included in all of the documentation supplied to Gulf prior to payment. Moreover, he contended Gulf knew of actual defenses, not just possible defenses prior to payment of claims. There are specific instances disputed as to the amount owed the subcontractor and specific instances when Gulf paid an amount beyond the amount requested by the subcontractor. Defendants assert they provided evidence

> that Gulf paid the subcontractors for extra work performed for the owner, not Construx; paid the subcontractors for materials that were actually furnished by Construx; paid the subcontractors whatever the subcontractors claimed was due and owing despite the clear terms of their contracts and invoice payments; paid the subcontractors for items furnished at a higher price quoted to the surety than was originally quoted to Construx; paid the subcontractors for defective work; and in one case (Apex Supply) even paid a subcontractor more than even the subcontractor claimed was due and owing.

While Gulf has responses to these claims, Defendants' submissions set forth specific facts needed to survive a motion for summary judgment, are not merely conclusory allegations, and are not just legal conclusions. Whether Gulf's actions were reasonable under the circumstances is a question of fact for determination after trial, not for summary judgment.

Gulf correctly argues that Defendants have the burden of establishing that Gulf did not act in good faith in settling the claims. Gulf also cites to evidence it presented regarding the extensiveness of the investigation of subcontractor claims it undertook and to the facts briefly set out

above regarding each of the claims.[20]  The reasonableness of the investigation is one factor relevant to the question of whether Gulf acted in good faith.  Stated another way, the surety has a duty to reasonably investigate the claim, counterclaim and all possible defenses and act in good faith in settling a claim.  *United States of America for the use of the Trustees of the Elec. Workers Local Pension Fund v. D Bar D Enter., Inc.*, 772 F. Supp. 1167, 1170 (D. Nev. 1991) (citations omitted).  However, because  Defendants have provided evidence to create factual disputes regarding the claims and the investigation, we cannot say that no reasonable mind could find that Gulf's investigation was  unreasonable.  And, the thoroughness of the investigation is not the only relevant factor.

Gulf also argues that the "self-serving statements" of Mr. Amszynski regarding the validity of the claims "ignores the subcontractors' and suppliers' positions, documentation, [and] representations of their own personnel."  We think Defendants' factual allegations dispute, rather than ignore, Gulf's evidence.  Gulf also argues that conclusory allegations of bad faith are insufficient to defeat a surety's motion for summary judgment to enforce an indemnity agreement.  The specific statements regarding various subcontractor claims are not conclusory allegations.  The question is whether, taking those allegations as true, those facts sufficiently raise a triable issue of the reasonableness and good faith of the settlement payments.

Finally, Gulf argues that its payment of the claims using its own money (above the $135,000 given it by the Settlement Agreement) is evidence of its good faith and the reasonableness of the settlements. "Gulf had sufficient internal and external incentives against settling the subcontractors' claims against Construx in bad faith.  It would not make sense for Gulf to settle claims in excess of a dollar amount in which it felt it was validly exposed to liability."  Such a defense is not sufficient to cut off examination of other facts and circumstances relevant to the issues of good faith and reasonableness.  "Of course a party's assertion that he acted out of a good faith belief is not the only relevant evidence."  *Lane v. John Deere Co.*, 767 S.W.2d at 140.

Gulf also states that Construx was required by the Indemnity Agreement to post sufficient collateral with Gulf if Construx wished to prevent the settlement of claims and that Construx did not post such collateral.  The Indemnity Agreement provides "in case the indemnitor requests the Company to join in the prosecution or defense of any legal proceeding, the indemnitor will, on demand of the Company, place it in funds sufficient to defray all expenses and all judgments that may be rendered therein."  There is no evidence in the record before us to show whether a demand was made for additional collateral or whether Construx posted such collateral.

And, in any event, Defendants have presented evidence that, by entering into the Settlement Agreement, they gave Gulf the $135,000 in remaining contract proceeds to use to settle the

---

[20]Again, Gulf relies on *Safeco*, where in the federal court adopted a standard from Texas law.  "'[N]either lack of diligence nor negligence is the equivalent of bad faith; and improper motive . . . is an essential element of bad faith.' *Engbrock v. Federal Insurance Company*, 370 F.2d 784, 787 (5th Cir. 1967) (citations omitted) (applying Texas law)." *Safeco*, 732 F. Supp. at 841.

subcontractor claims. Without the Settlement Agreement, Construx would have been entitled to the proceeds. Defendants also contend they agreed to allow Gulf to negotiate and settle the subcontractor claims and agreed to have the claimants deal directly with Gulf. Again, Defendants' position is that, absent the Settlement Agreement, Construx would have dealt with the subcontractors prior to the surety's involvement. Defendants specifically allege that Gulf informed Construx that if Construx would release all claims it had to the remaining loan proceeds, Gulf would use the loan proceeds as a fund out of which to pay all subcontractor claims as well as Gulf's attorney fees, and that Gulf represented that the loan proceeds were more than enough to fully satisfy subcontractor claims and attorney fees. Thus, there is a dispute as to whether Gulf requested collateral from Defendants and received it.

In light of the evidence in the record as to whether Gulf acted reasonably and in good faith in settlement of the claims and the expenses incurred therein, summary judgment is not appropriate, and the trial court's grant of judgment is reversed.

### VI.

We do not find it necessary to determine whether the alleged damages are adequately supported by the record in light of the fact that we find the motion for summary judgment inappropriate at this juncture. All of the damages, including attorney fees, awarded in accordance with the motion for summary judgment stemmed from the Indemnity Agreement and are, therefore, still in dispute.

### VII.

For the reasons set forth herein, we find that the trial court's grant of summary judgment was improper. Therefore, we reverse the order granting summary judgment to Gulf and remand this cause to the trial court for further actions consistent with this opinion. Costs of this appeal are taxed to the Plaintiff, Gulf, for which execution may issue, if necessary.

_____
PATRICIA J. COTTRELL, JUDGE